UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANIEL A. RILES II, | |
| PLAINTIFF, | Case No. 3:17-CV-02178-MPS |
| v. | |
| ROLLIN COOK, SCOTT SEMPLE, DAVE MAIGA, WILLIAM FANEUFF, GREGORIO ROBLES, WILLIAM MULLIGAN, DERRICK MOLDEN and ANGEL QUIROS | JULY 23, 2019 |
| DEFENDANTS. | |

## CORRECTED FIRST AMENDED COMPLAINT

### INTRODUCTION

1.      Plaintiff Daniel A. Riles II has been confined by the Connecticut Department of Correction ("DOC") since December 29, 2006. For approximately 80% of the time he has spent in DOC custody, Mr. Riles has been held in long-term solitary confinement at Northern Correctional Institution ("NCI"). This amounts to a full decade—nearly half of Mr. Riles's adult life—spent alone, in isolation from human contact. The DOC has placed Mr. Riles in solitary confinement pursuant to several "restrictive status" classifications: "administrative segregation," "chronic discipline status," and "special needs management."

2.      As widely understood, "solitary confinement"—regardless of whether it is referred to as "restrictive status," "administrative segregation," "chronic discipline status," "special needs management," or some other term—entails: (1) removal from the general inmate population;

(2) placement alone in a locked room or cell; (3) inability to leave the room or the cell for the vast majority of every day; and (4) near-total deprivation of contact with other human beings. The various "restrictive status" designations at NCI differ in certain ways, but each of them fit the widely understood definition of solitary confinement.

3.      It is well known, and recognized by courts, leading corrections officials, and experts in the field of prison science, that placing inmates in long-term solitary confinement causes them wide-ranging and often permanent physical and psychological harm. Extensive scientific research demonstrates that people consistently suffer a number of dysfunctional psychological states and outcomes when deprived of meaningful social contact and a normal range of sensory input (such as exposure to natural light, outdoor sounds, and varying colors) for long periods. According to experts, these harms can manifest in as little as 10 to 15 days.

4.      Solitary confinement at NCI is particularly cruel. NCI is Connecticut's sole "supermax" prison, purpose-built to isolate prisoners. Six housing units extend off a long, windowless hallway, designed to give the impression of walking underground. Inside the units, it is difficult for individuals to get bearings on their surroundings, because of the disorienting, kaleidoscopic arrangement of mirrored windows and concrete walls.

5.      NCI was designed and intended to impose conditions that were far more punitive than those of typical prison life. Indeed, NCI's architect has stated that the prison's landscape of concrete, mirrors, and razor wire was designed in response to the DOC's instruction to make NCI "hard." Yale Visual Art Project, *The Worst of the Worst: Portrait of a Supermax* (2012), *available at* https://vimeo.com/54826024 (interview with James Kessler). "When we were designing [NCI]," the

architect said, "there was a desire that [inmates'] first experience would make an impression—the limited environment, the lack of stimulus…" *Id.* Being sent to NCI is, in the words of the State's former Undersecretary for Criminal Justice Policy and Planning, "the ultimate sanction." *Id.* (interview with Michael Lawlor).

6.      Inmates who are housed at NCI, like Mr. Riles, spend virtually all of their time alone in a cell that is roughly the size of a burial plot, with concrete walls that amplify and reverberate sound, metal furniture, harsh fluorescent lighting, and a 3-inch-wide window that affords little natural light or fresh air. The cell doors are solid steel, except for a small slit or "trap" through which correctional officers feed prisoners or handcuff them before they can leave their cells.

7.      These conditions of confinement are cruel and unusual in and of themselves. But in Mr. Riles's case, this constitutional injury has been compounded by another constitutional injury: for much of his solitary confinement, Mr. Riles was given no meaningful opportunity for review of his restrictive status. The limited reviews that Defendants did undertake were rote and mechanical.

8.      Simply put, there is no predictable way to progress out of solitary confinement. The various "restrictive status" classifications set forth in DOC Administrative Directive 9.4 amount to vague standards and malleable jargon used to conceal what is nothing more than an indefinite solitary confinement. This is particularly so with respect to solitary confinement on "special needs management" status which is, on its face, an "indefinite" status. *See* RESTRICTIVE HOUSING STATUS—PROVISIONS AND MANAGEMENT STANDARDS (2016), https://portal.ct.gov/-/media/DOC/Pdf/Ad/ad0904attbpdf.pdf?la=en.

9.      During his years-long term of solitary confinement on special-needs status and other "restrictive statuses," Mr. Riles was not provided notice of, or permitted to attend, any of the periodic reviews of his status. And he was deprived of any opportunity to earn so-called "risk reduction" credits even though the Defendants frequently penalized him with "negative" credits for even minor disciplinary infractions. Further confirming the arbitrariness of the DOC's restrictive statuses, when Mr. Riles finally moved off restrictive status in May 2018—after filing his original Complaint in this matter—neither the DOC nor any individual Defendant provided him with any reason for his release into the general population. Nor did they provide Mr. Riles with any programming to prepare him for general population. No meaningful psychological evaluation was performed before the transfer took place.

10.      Given this history, there is no assurance that Defendants will keep Mr. Riles in general population (and out of solitary confinement) for the duration of his incarceration. To the contrary, it is highly likely that Mr. Riles will be returned to long-term solitary confinement before he is released. Indeed, since his return to general population, he has been placed in "punitive segregation" on several occasions and he has been transferred to three different correctional facilities so far.

11.      The years Mr. Riles has spent languishing in solitary confinement with no meaningful social interactions have taken their toll. Among other things, Mr. Riles experiences emotional distress, anxiety attacks, and other mental health issues. His pre-existing anger management and social interaction issues have been exacerbated. He also experiences nerve damage from the years in solitary confinement when he was led around in full restraints when outside his cell. And his vision has

deteriorated as a result of the harsh fluorescent lighting at NCI, along with the frequent use of chemical sprays on his face.

12.     Defendants' actions violate the United States Constitution. First, the conditions that Mr. Riles has been subjected to present a known and scientifically documented risk of physical and mental harm that constitutes cruel and unusual punishment in violation of the Eighth Amendment. Second, Mr. Riles's Fourteenth Amendment due process rights have been violated. Under well-established precedent, a sustained, lengthy period in solitary confinement is a deprivation of a protected liberty interest. Mr. Riles was denied the process due to him when Defendants failed to conduct meaningful periodic reviews of Mr. Riles's restrictive designation.

## JURISDICTION AND VENUE

13.     Plaintiff brings claims pursuant to 42 U.S.C. § 1983 as well as the Eighth and Fourteenth Amendments to the United States Constitution.

14.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

15.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2).

## PARTIES

16.     Daniel A. Riles II is a 42-year-old man from New Haven, Connecticut. He is currently serving a 15-year sentence for criminal attempt and has been in DOC custody since December 29, 2006. His maximum release date is December 17, 2021, and he is eligible for parole in September 2019. Mr. Riles is currently confined at Cheshire Correctional Institution ("Cheshire") in Cheshire, Connecticut. Mr. Riles was previously confined at Bridgeport Correctional Center ("BCC") in Bridgeport, Connecticut; Garner Correctional Institution ("Garner") in Newtown, Connecticut;

Hartford Correctional Center ("HCC") in Hartford, Connecticut; MacDougall-Walker Correctional Institution ("MacDougall-Walker") in Suffield, Connecticut; New Haven Correctional Center ("NHCC") in New Haven, Connecticut; and—for a substantial majority of his incarceration—at NCI in Somers, Connecticut.

17.     Defendant Rollin Cook is the current Commissioner of the DOC. He is responsible for protecting the constitutional rights of all individuals in DOC custody, including Mr. Riles. Mr. Cook has final policy-making and supervisory authority within the DOC and is therefore responsible for authorizing and maintaining policies and customs challenged by Mr. Riles. At all relevant times, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief.

18.     Defendant Scott Semple was the Commissioner of the DOC from 2014–2018. At all relevant times, he acted under the color of state law and had final policy-making and supervisory authority within the DOC. During his tenure as DOC Commissioner, Mr. Semple was responsible for protecting the constitutional rights of all individuals in DOC custody. Additionally, he was personally involved in promulgating DOC Administrative Directive 9.4's system for designating "special needs management" status and other "restrictive status" classifications, and for preventing designated inmates from earning and receiving Risk Reduction Earned Credit. He was also personally involved in authorizing and maintaining policies and customs that kept Mr. Riles in solitary confinement for years on end. He directly and proximately caused the constitutional violations set forth below. Mr. Semple also deliberately failed to respond to a Level-3 grievance filed by Mr. Riles

on December 6, 2017 concerning the conditions of his confinement. He is sued in his individual capacity for damages.

19. The following Defendants have and/or had specific roles in designating and maintaining Mr. Riles as a "special needs management" status prisoner on solitary confinement, and (in some cases, as outlined below) deliberately ignored grievance claims filed by Mr. Riles seeking to end the constitutional violations:

a. Dave Maiga is the Director of Offender Classification and Population Management. His unit coordinates offender classification efforts and is responsible for the assignment of offender movement throughout the entire infrastructure of the DOC. The unit is also responsible for assessment and classification of all adult males sentenced to greater than 2 years' incarceration. In this capacity, he had supervisory authority and was personally involved with Mr. Riles's various "restrictive status" classifications and his confinement in solitary confinement. Additionally, he is a member of the Unit Classification Committee, a review board that oversees and is responsible for inmates on "special needs management" status. He directly and proximately caused the constitutional violations set forth below. At all relevant times, Mr. Maiga acted under color of state law. He is sued in his official capacity for declaratory and injunctive relief, and in his individual capacity for damages.

b. William Faneuff is a senior DOC employee who has served in a number of high-level positions, including as Warden at HCC and NCI. He is a member of the Unit Classification Committee, a review board that oversees and is responsible for inmates

on "special needs management" status. He personally authorized and maintained the policies and practices challenged by Mr. Riles. Mr. Faneuff repeatedly signed off and participated in maintaining Mr. Riles in the status of "special needs management" and on solitary confinement, without regard to Mr. Riles's constitutional rights. He also deliberately failed to respond to a Level-1 grievance filed by Mr. Riles on August 30, 2017, concerning his conditions of confinement. When Mr. Riles directly asked Mr. Faneuff about the status of his grievance, Mr. Faneuff refused to provide a substantive response to Mr. Riles, and instead he accused Mr. Riles of having an attitude. Mr. Faneuff directly and proximately caused the constitutional violations set forth below, and was unresponsive to Mr. Riles's appeals to end the constitutional violations. At all relevant times, he acted under color of state law. He is sued in his official capacity for declaratory and injunctive relief, and in his individual capacity for damages.

c.  Gregorio Robles is a Unit Manager at NCI. In this capacity, he is responsible for NCI Unit 1-West which warehouses all "special needs management" status prisoners confined at NCI. Additionally, he is the Chairperson of the Unit Classification Committee, a review board that oversees and is responsible for inmates on "special needs management" status. He directly and proximately caused the constitutional violations set forth below. At all relevant times, he was acting under the color of state law. He is sued in his official capacity for declaratory and injunctive relief, and in his individual capacity for damages.

d.  William Mulligan was the Warden at NCI from 2016-2017, and the Warden at MacDougall-Walker from 2017-2019. He also previously was a Deputy Warden at NCI. While at NCI, Mr. Mulligan was personally involved in authorizing and maintaining policies and customs challenged by Mr. Riles. During the relevant time period, he was a member of the Unit Classification Committee, a review board that oversees and is responsible for inmates on "special needs management" status. He directly and proximately caused the constitutional violations set forth below. At all relevant times, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief, and in his individual capacity for damages.

e.  Derrick Molden is the Deputy Warden of Operations, Administration, Programs, and Treatment. In this capacity, he possesses policy-making and supervisory authority with respect to inmate classification. Mr. Molden was personally involved in authorizing and maintaining policies and customs challenged by Mr. Riles. Additionally, he is a member of the Unit Classification Committee, a review board that oversees and is responsible for inmates on "special needs management" status. Mr. Molden deliberately failed to respond to the "informal resolution" grievance filed by Mr. Riles on August 8, 2017. He directly and proximately caused the constitutional violations set forth below. At all relevant times, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief, and in his individual capacity for damages.

f.  Angel Quiros is the Regional Warden of NCI and HCC. He possesses policy-making and supervisory authority within the region that includes both NCI and HCC. He was personally involved in authorizing and maintaining policies and customs challenged by Mr. Riles. Mr. Quiros has repeatedly met with Mr. Riles during facility tours, at which time Mr. Riles has expressed that his classification on "special needs management" and long-term solitary confinement were unconstitutional. Mr. Quiros deliberately failed to respond to the Level-2 grievance filed by Mr. Riles on October 20, 2017. He directly and proximately caused the constitutional violations set forth below. At all relevant times, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief, and in his individual capacity for damages.

## FACTUAL BACKGROUND

20.  Mr. Riles was incarcerated in DOC facilities beginning on December 29, 2006, in connection with a charge of criminal attempt. He was convicted, and later sentenced to 15 years' imprisonment on June 10, 2008.

21.  Mr. Riles has compiled a lengthy disciplinary history during his time in DOC facilities, including approximately 300 disciplinary tickets during his 12.5-year period of incarceration. However, all but a handful of Mr. Riles's disciplinary tickets are for relatively minor infractions like insubordination and threatening an officer, the sort of tickets Corrections Officers routinely give to inmates that are, or are perceived to be, disrespectful of authority.

22.     Mr. Riles's behavior is symptomatic of untreated mental illnesses (including anxiety) and anger management issues. But Defendants have never meaningfully considered whether Mr. Riles's behavior should be addressed therapeutically by mental health professionals, rather than through brute discipline meted out by correctional authorities. Indeed, Defendants have never seriously attempted to treat Mr. Riles's mental health and anger management issues. To the contrary, they have dramatically exacerbated and worsened Mr. Riles's condition by keeping him in solitary confinement for years on end. This treatment has been detrimental (likely permanently so) to his mental health, ability to control his anger, and ability to interact with others in a socially acceptable manner.

23.     Upon his initial entry to the DOC system, Mr. Riles was housed in general population at BCC. However, upon receiving three disciplinary tickets within approximately three months, he was transferred in March 2007 to NCI where he was placed on "chronic discipline status." This "restrictive status" designation is purportedly used for "management of an inmate whose behavior, while incarcerated, poses a threat to the security and orderly operation of the facility, or a risk to the safety of staff or other inmates." DOC Administrative Directive 9.4(3)(H). While on "chronic discipline status," Mr. Riles was forced to spend 23 hours a day alone inside his assigned cell.

24.     As alleged above, NCI is no ordinary prison. NCI is Connecticut's only maximum security facility. It seals people inside cement cells roughly the size of burial plots for 23 hours a day. A slot in each solid metal door allows in-cell feeding. Each cell measures 7 by 12 feet and has a metal bed, a metal toilet and sink, and a 36 x 18 inch stainless steel desk with an attached metal stool. A window that is 3 inches wide and 34 inches long looks out at three layers of fencing.

11

25.    NCI largely consists of hard cement, metal, and glass surfaces that reflect rather than absorb sound, and can cause visual disorientation. The exterior cinder block walls make it impossible to regulate the heat. It is often excessively cold or excessively hot inside the cells. The plumbing is also frequently broken, causing excrement to back up into cell toilets.

26.    Prisoners at NCI may not leave their cells without submitting to an invasive strip search. And they generally can only leave their cells for limited circumstances—for example, showering three to five times per week and taking an hour of "recreation" five days per week (in a steel cage surrounded by high concrete walls).

27.    When they do leave their cells, DOC policies generally require that inmates be "fully restrained" with handcuffs, leg irons, and a tether chain. Those chains follow inmates everywhere they go. When showering, individuals are shackled at their ankles. When placed in the "recreation" cage, they typically must wear shackles at their wrists, unless they are on "rec alone" status, which means they are in the cage by themselves and deprived of social contact.

28.    Interactions with the outside world are also extremely limited, typically restricted to just one thirty-minute social visit per week. Visits are "non-contact" and occur via phone through a thick, Plexiglass barrier, and individuals must be in full restraints (wrists, ankles, and tether chain).

29.    As portrayed in the award-winning documentary *The Worst of the Worst: Portrait of a Supermax* (2012), NCI frequently inflicts severe damage on those who spend time there. (The documentary may be viewed at https://vimeo.com/54826024.) This includes inmates whose psychiatric disabilities are exacerbated and who experience cognitive deterioration and psychotic symptoms such as paranoia, hallucinations, and self-harming. It also includes correctional officers and

other DOC employees, who all too often experience mental and physical health challenges, including post-traumatic stress disorder, after working at NCI.

30. Mr. Riles experienced oppressive conditions at NCI for years on end. While incarcerated at the facility, Mr. Riles never had more than one or two hours a day of "outside" recreation. This time was spent—generally alone—in a small fenced cage within a concrete area that was open to the sky above, but otherwise not "outside" in any normal sense of the word. He had no access to meaningful educational and other programming. His interactions with other people were extremely limited. When taken outside of his cell, he was generally in full body restraints (wrists, ankles, and tether chain).

31. Mr. Riles completed his initial period on chronic disciplinary status at NCI in September 2007, and was sent back to general population at NHCC. However, by January 2008, he was placed on chronic disciplinary status again and sent back to NCI.

32. In February 2008, while still at NCI, a corrections officer sprayed "Mace" (an aerosol used to immobilize or disable a person temporarily) in Mr. Riles's face. While trying to remove the harsh chemical from his mouth, Mr. Riles spat and his saliva hit an officer's clothing. As a result, he was charged (criminally and administratively) with assault. The criminal charges against him were nolled by the Connecticut State's Attorney's Office, but the DOC nevertheless found him guilty of the administrative charge and placed him on administrative-segregation status at NCI beginning in March 2008.

33. "Administrative segregation" status purportedly applies to individuals if their "behavior or management factors pose a threat to the security of the facility…staff or other inmates"

and if they "can no longer be safely managed in general population." DOC Administrative Directive 9.4(3)(B). "Administrative segregation" status has "phases" through which individuals must "progress" before they can complete the status. Individuals in Phase I must spend a minimum of 4 months at NCI before they can be reviewed to progress to Phase II, and thereby be eligible to leave NCI for another DOC facility. So long as an individual is still "in the program"—a minimum of 10 months— they are at constant risk of being returned to Phase I and to NCI upon receipt of a single disciplinary ticket, no matter how insignificant. Causes for return to Phase I include receiving disciplinary reports or displaying a "poor attitude" or a "lack of motivation." It is not uncommon for someone to have nearly reached the end of one of these statuses only to return to Phase I, to begin all over again.

34.     That is exactly what happened to Mr. Riles. He remained on administrative-segregation status for over six years, the vast majority of which was spent in Phase I at NCI. Twice, he proceeded briefly to Phase II of the "administrative status" system at Cheshire, where he was still kept in isolation from the rest of the prison. But, each time, Mr. Riles received a disciplinary ticket sending him back to the starting line at NCI.

35.     During this time, Defendants did not conduct any meaningful review of Mr. Riles's conditions of confinement. Even though virtually all of Mr. Riles's disciplinary infractions were nonviolent and involved insubordinate behavior (real or perceived), Defendants never considered alternative approaches to discipline other than repeatedly returning Mr. Riles to "square one" of the administrative segregation program. They did not consider whether Mr. Riles's disciplinary issues could be the product of treatable mental-health, anger-management, and social disorders.

36.     Defendants' decision to house Mr. Riles in solitary confinement under an "administrative segregation" designation was unsupported by any valid penological theory.

37.     In October 2014, after more than six years spent in administrative segregation, Mr. Riles was abruptly shifted—without a hearing or other formal process—to "special needs management" status. No hearing was convened before this change. Defendants didn't bother to articulate a reason to justify this sudden transfer to an explicitly "indefinite" status.

38.     Special-needs status is authorized by DOC Administrative Directive 9.4 and Attachments A and B to that Directive. This status is purportedly for "inmates who have demonstrated behavioral qualities either through the serious nature of their crime, behavior, or through reasonable belief that they pose a threat to the safety and security of staff, other inmates, themselves, or the public." DOC Administrative Directive 9.4(3)(V).

39.     While on "special needs" status, Mr. Riles remained in solitary confinement at NCI. His "Special Needs Custody Management Plan" required that Mr. Riles be placed in "full restraints" when moving outside of his cell. The "Special Needs Custody Management Plan" further provided that he would have no work assignment and would not participate in any programs.

40.     Under Administrative Directive 9.4 and its Attachments, and as noted above, an inmate on "special needs management status" can be held indefinitely in this status, with the only check being a "classification hearing" that is supposed to be held every six months.

41.     In fact, Mr. Riles's six-month "classification hearings" were treated by Defendants as a perfunctory formality. Mr. Riles was never permitted to participate in or be present at these "hearings" and, upon information and belief, the hearings lacked any meaningful consideration of:

(1) appropriate alternative classifications; (2) mental health care that should be provided to Mr. Riles; and (3) the impact that long-term solitary confinement had already had and would continue to have on his wellbeing and rehabilitation.

42.     According to Administrative Directive 9.4, an inmate on "special needs management status," "chronic discipline status," or "administrative segregation" cannot earn or receive Risk Reduction Earned Credit that would otherwise be available pursuant to Conn. Gen. Stat. § 18-98e. However, perversely, inmates can *lose* risk-reduction credits that they have already earned and can even lose credits that they have not earned, resulting in a deficit.

43.     While still on "special needs management" status, Mr. Riles was transferred from NCI to HCC in May 2015. Upon information and belief, Mr. Riles's transfer from NCI to HCC was a pretextual attempt to make it appear that the Defendants were trying to ease Mr. Riles back into general prison population. In fact, the new "Special Needs Custody Management Plan" provided Mr. Riles with no programming, no job assignment, and no meaningful mental health care.

44.     Given these circumstances, Mr. Riles's mental health, social interactions, and conduct did not improve at HCC, and Defendants transferred him back to NCI in July 2015. There, Mr. Riles was once again subject to the cruel and unusual solitary confinement described above.

45.     Mr. Riles remained at NCI until April 2017, when he was transferred back to HCC. Mr. Riles was still classified in "special needs management status" without access to correctional programming, a job assignment, or meaningful mental health treatment.

46.     Although Mr. Riles was returned to HCC, his return did not last long. In August 2017, the DOC abruptly transferred Mr. Riles back to NCI where he was once again subject to cruel and unusual solitary confinement.

47.     Throughout his time on special-needs status, Mr. Riles still was not eligible to earn and receive Risk Reduction Earned Credit. Nevertheless, Defendants persisted in deducting risk-reduction credits from Mr. Riles, even though he had none to give. As explained above, under Defendants' policies, an inmate on indefinite "special needs management status" who accumulates disciplinary tickets loses Risk Reduction Earned Credit regardless of whether he has any such credits in the first place. Each time Mr. Riles accumulated a disciplinary ticket—even for relatively minor offenses—he lost at least 5 to 10 credits, and sometimes many more credits. As a result, he now "owes" over a thousand days of Risk Reduction Earned Credits—a deficit he cannot possibly earn his way out of.

48.     That Mr. Riles was placed in an indefinite restricted status that permitted the Defendants to deduct risk-reduction credits but did not permit him to earn risk-reduction credits was fundamentally unfair.

49.      On December 29, 2017, while still in solitary confinement at NCI on "special needs management status," Mr. Riles initiated this lawsuit, challenging the conditions of his confinement.

50.     On January 18, 2018, the District Court dismissed Mr. Riles's *pro se* original Complaint *sua sponte* pursuant to 28 U.S.C. § 1915A for failure to meet the requirements of Federal Rules of Civil Procedure 8 and 20. However, on February 1, 2019 the Second Circuit vacated the District Court's judgment and remanded for further proceedings, holding that the original Complaint

satisfied the requirements of Rule 8 and largely satisfied Rule 20's joinder requirements. *Riles v. Semple*, 763 F. App'x 32, 34 (2d Cir. 2019). Additionally, the Second Circuit appointed the undersigned counsel to represent Mr. Riles *pro bono* in further proceedings before the District Court or the Court of Appeals.

51.   On May 9, 2018, after Mr. Riles filed his appeal to the Second Circuit, he was suddenly and without explanation transferred from solitary confinement at NCI to "special monitoring" status within general population at MacDougall-Walker.

52.   "Special monitoring" is a status "designation which provides for increased supervision and monitoring upon an inmate's completion of a special management program or for reasons of safety and security." DOC Administrative Directive 9.4(3)(U). It is not a "restrictive status" classification; rather, it is a "general population" classification. *Id.* at 9.4(3)(T) (listing "restrictive status" designations and not including "special monitoring").

53.   In advance of Mr. Riles's transfer to general population, Defendants did not undertake any meaningful psychological evaluation or provide Mr. Riles with any meaningful rehabilitative programming.

54.   This spontaneous re-classification of Mr. Riles to general population is compelling evidence that Defendants' various restrictive status classifications over the years were arbitrary and capricious and lacked any penological justification.

55.   Although Mr. Riles was returned to general population in May 2018, he has since been placed in "punitive segregation" on several more occasions since then, including for purported "civil disobedience" and "refusing housing."

56.     Additionally, Mr. Riles has been repeatedly transferred between prisons, sometimes under suspect circumstances. For example, in late April of this year while housed at MacDougall-Walker, Mr. Riles was told by DOC officials that he would imminently be receiving a prison job. But, days later, he was transferred to Garner. And then, in recent weeks, he was transferred yet again to Cheshire.

57.     In light of the history alleged above, it is entirely likely that Mr. Riles will be returned to restrictive status and forced to endure the cruel and unusual conditions of solitary confinement at NCI in the future.

58.     Given his years in solitary confinement and on "special needs management status," Mr. Riles's transition to general population has been extremely challenging. After years spending 22 or 23 hours a day alone in an austere concrete box, he has lived, on and off over the past year, with a cell mate. Mr. Riles struggles mightily to engage in normal social interactions with his cell mate and other prisoners. Indeed, in mid-June while being housed at Garner, Mr. Riles was assaulted by his cell mate and another inmate, sustaining injuries.

59.     During his time in DOC facilities, Mr. Riles has received virtually no rehabilitative programming or job assignments. Indeed, the "Special Needs Custody Management Plans" that Defendants created specified that Mr. Riles would have no programming and no work assignment while on special-needs status. What's more, in the entire twelve and a half years that Mr. Riles has been incarcerated, he has been assigned a prison job only once, for about two weeks.

60.     Defendants have also failed to provide Mr. Riles with adequate mental health treatment. As noted above, Mr. Riles suffers from significant mental health challenges including

anxiety and depression. During his time in DOC custody, these issues have been exacerbated in obvious, visible ways. Mr. Riles has even be hospitalized for anxiety symptoms, for example. Nevertheless, during his entire twelve and a half years of incarceration, Mr. Riles has only been provided with a regular therapist once for a three-week period.

61. Mr. Riles's mental health treatment has been particularly poor during his time at NCI. At that facility, inmate interactions with mental health staff are generally cursory and/or take place in non-confidential settings. Indeed, a typical interaction with a mental health worker happens through the locked cell door. If an individual does see a clinician outside of his cell, a correctional officer—who is not subject to patient-clinician confidentiality—is typically present. Under these circumstances, many individuals are unwilling to share their mental health concerns, for fear that they will be overheard and stigmatized.

62. Mr. Riles's experiences with mental health care are sadly typical of the quality of care provided to inmates in DOC custody. Indeed, a Pew Charitable Trusts and Vera Institute of Justice survey from October 2017 found that Connecticut has one of the worst prison health care quality monitoring systems in the nation. Pew Charitable Trusts, *Prison Health Care: Costs and Quality* (Oct. 2017), available at http://www.pewtrusts.org/~/media/assets/2017/10/sfh_prison_health_care_costs_and_quality_final.pdf.

63. The approximately ten and a half years he has spent in solitary confinement and on "restrictive statuses," including "special needs management status," have caused Mr. Riles severe and likely irreversible harm. He has suffered physical harm, including nerve damage resulting from the frequent use of restraints and shackles, as well as damage to his vision resulting from the harsh

fluorescent lighting at NCI. He has suffered severe emotional distress, anxiety attacks, and other mental health issues resulting from his near-total isolation from other human beings and lack of meaningful exercise and recreation. His pre-existing anger-management and social-interaction issues have been exacerbated. And, as his release date approaches, he has received virtually no rehabilitative programming that would enable him to reintegrate into society.

## CLAIMS FOR RELIEF

### First Cause of Action: 42 U.S.C. § 1983 - Eighth and Fourteenth Amendment
### (Cruel and Unusual Punishment)

64.  Mr. Riles incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

65.  By designating and maintaining Mr. Riles in long-term solitary confinement, Defendants deprived Mr. Riles of the minimum civilized measure of life's necessities, and have violated his basic human dignity in violation of contemporary standards of human decency.

66.  Defendants' prolonged confinement of Mr. Riles in solitary conditions on "restrictive status" constitutes cruel and unusual punishment. This confinement has inflicted severe harm on Mr. Riles, and there is a substantial risk of future harms.

67.  Defendants have been deliberately indifferent to the obvious and well-documented risk of these harms.

68.  Mr. Riles's long-term solitary confinement serves, and has served, no legitimate penological purpose. Although Defendants have at times used disciplinary infractions to justify the conditions of Mr. Riles's confinement, Defendants have deliberately failed to address these disciplinary issues in any constructive way, or to consider that Mr. Riles's behavioral issues are the product of

21

mental-health issues that are plainly exacerbated by being placed in solitary confinement, without meaningful mental-health treatment or rehabilitative programming.

69.     The history of classification and re-classification alleged herein, and movement in and out of solitary confinement, demonstrates that there is a cognizable danger that Mr. Riles will be placed back on "special needs management" status (or another "restrictive status") and/or moved back to solitary confinement at NCI, thereby again violating his right to be free from cruel and unusual punishment.

70.     By the foregoing actions, Defendants have violated Mr. Riles's Eighth and Fourteenth Amendment rights.

### Second Cause of Action: 42 U.S.C. § 1983 - Fourteenth Amendment
### (Procedural Due Process)

71.     Mr. Riles incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

72.     Mr. Riles possesses a constitutionally protected liberty interest in avoiding long-term solitary confinement and classification under "special needs management" status (or any "restrictive status").

73.     Among other sources, this liberty interest arises from: (1) the DOC's own policies mandating periodic reviews of inmates placed in "special needs management" and other restrictive statuses; and (2) the harsh and isolating conditions of long-term solitary confinement at NCI, which is an atypical and significant hardship as compared with the ordinary incidents of prison life.

74. Mr. Riles's designation and maintenance on "special needs management status" also deprived him of eligibility to earn and receive Risk Reduction Earned Credit, even though Defendants were able to deduct Risk Reduction Earned Credit that he never even had in the first place.

75. Mr. Riles was entitled to meaningful periodic review of whether there was a sustaining and valid reason for continuing to hold him in solitary confinement under "special needs management" status (or any other "restrictive statuses").

76. Defendants failed to provide a meaningful review, and they failed to provide Mr. Riles with a meaningful opportunity to present his views about classification in solitary confinement on "special needs management" or other "restrictive statuses."

77. The arbitrary and groundless manner in which Defendants have moved Mr. Riles in and out of solitary confinement shows that their classification decisions lack any legitimate penological basis. The various "restrictive status" classifications pursuant to DOC Administrative Directive 9.4 amount to a system of rote and mechanical reviews using vague standards to conceal what is nothing more than an indefinite solitary confinement. There is no predictable way to progress out of "special needs management" status and out of solitary confinement

78. When Defendants abruptly decided (after this lawsuit was filed) that they would remove Mr. Riles out of any restrictive status and place him into general population, they did so with no meaningful review or consideration, and without any appreciable change in circumstances. This latest re-classification is demonstrative of the arbitrariness of Defendants' classification decisions with respect to serious, harsh, and debilitating conditions of solitary confinement.

79.     This history of classification and re-classification, and movement in and out of solitary confinement, demonstrates that there is a cognizable danger that Mr. Riles will be placed back on "special needs management" status (or another "restrictive status") and/or moved back to solitary confinement at NCI, thereby again violating his right to be free from cruel and unusual punishment.

80.     By the foregoing actions, Defendants deprived Mr. Riles of his right to procedural due process of law in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Riles prays for judgment against the Defendants:

(a) Declaring that Defendants have violated Mr. Riles's rights to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the U.S. Constitution;

(b) Declaring that Defendants have violated Mr. Riles's rights to procedural due process under the Fourteenth Amendment of the U.S. Constitution;

(c) Granting permanent injunctive relief enjoining Defendants and their successors, agents, and assigns from further violation of the Eighth and Fourteenth Amendments of the U.S. Constitution;

(d) Awarding Mr. Riles compensatory damages for Defendants' constitutional violations, including but not limited to Mr. Riles's emotional pain and suffering;

(e) Awarding Mr. Riles punitive and nominal damages;

(f) Awarding Mr. Riles costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

(g) Granting such other monetary, equitable, or other relief as is authorized by law and as the

Court deems just and proper.

Plaintiff seeks a jury trial on all issues so triable.

Respectfully submitted,

/s/ Tadhg Dooley
Tadhg Dooley (ct29364)
David Norman-Schiff (ct30082)
WIGGIN AND DANA LLP
One Century Tower, P.O. Box 1832
New Haven, CT, 06508-1832
Telephone: 203-498-4400
Facsimile: 203-782-2889
tdooley@wiggin.com
dnorman-schiff@wiggin.com

*Counsel for Plaintiff*

28055\1\4844-6025-9228.v1

25