UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DANIEL A. RILES, II, # 235288      :      CIVIL NO. 3:17-CV-02178 (MPS)

     v.      :

SCOTT SEMPLE, ET AL.      :      MAY 20, 2022

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The instant action challenges the plaintiff's conditions of confinement while in the custody of the Connecticut Department of Correction ("DOC") as a sentenced prisoner and housed at the Northern Correctional Institution ("Northern") while on "Special Needs Management" status ("special needs"), as well as challenges his classification on special needs allegedly without meaningful review of the necessity of the confinement or classification. *See* (ECF No. 110, p. 2; ECF No. 21). The plaintiff asserts that the defendants, who are all current or former DOC officials, violated his rights under the Eighth and Fourteenth Amendments. (*Id.*). The defendants deny these claims. *See* (ECF No. 30).

The defendants now move for summary judgment as to all claims as the undisputed material facts establish that they are entitled to judgment as a matter of law on the following grounds: (1) the plaintiff cannot establish the personal involvement of defendants Semple, Quiros, Maiga, or Mulligan in a constitutional violation; (2) the plaintiff's Fourteenth Amendment procedural due process claim fails as a matter of law; (3) the plaintiff's Eighth Amendment claim fails as a matter of law; and (4) alternatively, the defendants are entitled to qualified immunity as to the plaintiff's constitutional claims.

## I.      RELEVANT PROCEDURAL BACKGROUND & FACTS

### A.    Court's Exhaustion Rulings

The Court has limited the timeframe and scope of the plaintiff's claims in this case based on his failure exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). Indeed, on November 29, 2021, the Court ruled that the plaintiff only "properly exhausted his claims as to his placement on 'special needs management' status and conditions of confinement from August 1, 2017 onward, but not as to his classification and conditions prior to that

date." (ECF No. 110, p. 8). The Court further concluded that because the plaintiff "did not properly exhaust his claims as to the period preceding August 1, [2017], [he] cannot seek damages arising from events occurring before that date." (*Id.* at 1). In other words, the plaintiff's Eighth Amendment claim, and his Fourteenth Amendment claim, are limited to occurrences on or after August 1, 2017.

On January 13, 2022, the Court issued another ruling concerning exhaustion, finding that the plaintiff only exhausted certain components of his Eighth Amendment claim. *See* (ECF No. 115). Specifically, the Court found that the plaintiff "has exhausted those components of his Eighth Amendment claim challenging his confinement in a small cell for most of each day, his lack of access to recreational and other programming, his lack of contact with the outside world, and the requirement that he be in 'full restraints' outside his cell; but that he has not exhausted those components based on temperature, lighting, or plumbing in his cell; the prison's use of strip searches and chemical sprays; or the alleged inadequacy of the mental health treatment provided to him." (*Id.* at 9).

Furthermore, there can be no dispute that the plaintiff's Fourteenth Amendment procedural due process claim relates to the alleged lack of meaningful reviews while he was on special needs,[1] or that his Eighth Amendment claim relates to his confinement at Northern.[2] Nor can there be any dispute that after August 1, 2017, the plaintiff was only housed at Northern while on special needs from August 1, 2017 until May 9, 2018. Indeed, the plaintiff was removed from special needs on April 26, 2018, and on May 9, 2018, he transferred from Northern to the MacDougall-Walker Correctional Institution ("MWCI") within the general inmate population. (Def. L. R. 56(a)(1) Statement, ¶¶ 39, 64-65).

In short, in light of the nature of the claims and the Court's exhaustion rulings, the claims remaining in this case are as follows: (1) a Fourteenth Amendment procedural due process claim

---

[1] *See* (ECF No. 110, p. 2) ("The plaintiff alleges that . . . his confinement and classification 'as special needs management' status without meaningful review of the necessity of the confinement or the classification violated his due process rights in violation of the Fourteenth Amendment."); *see also* (ECF No. 21, ¶¶ 72-73, 75-77).

[2] *See* (ECF No. 115, p. 3) ("Mr. Riles challenges various conditions of his confinement at Northern Correctional Institution ('NCI') under the Eighth Amendment."); *see also* (ECF No. 21, ¶¶ 1, 4-6, 11, 24-30, 39, 44-46, 49, 57, 61-62).

regarding the alleged lack of meaningful reviews of the plaintiff's status on special needs between August 1, 2017 and April 26, 2018, when he was removed from that status; and (2) an Eighth Amendment claim arising from the plaintiff's confinement at Northern between August 1, 2017 and May 9, 2018, when he transferred to MWCI, and which relate to his confinement at Northern in a small cell for most of each day, his lack of access to programming, his lack of contact with the outside world, and being placed in full restraints for movements outside of his cell.

### B. The Defendants, Northern, & Special Needs Status

During the relevant time, August 1, 2017 to May 9, 2018, each of the defendants held supervisory positions at DOC. Specifically, Semple was the Commissioner, Quiros was a District Administrator, Maiga was Director of DOC's Offender Classification and Population Management Unit ("OCPM"), Mulligan was the Warden at MWCI, Molden was the Deputy Warden at Northern, Robles was a Captain at Northern, and Faneuff was the Warden at Northern until October 13, 2017, and then was the Warden at the Osborn Correctional Institution ("Osborn") until March 1, 2018, when he retired from the DOC. (*Id.* at ¶¶ 3, 5, 8, 11-12, 14, 16). At no point between August 1, 2017 and May 9, 2018, were Semple, Quiros, Maiga, or Mulligan stationed at Northern, nor did they have any involvement in, or control over, the day-to-day operations or conditions at Northern. (*Id.* at ¶¶ 3-11).

Northern was a Level-5, maximum security facility, which closed in June 2021, and was used to house and manage inmates who demonstrated a serious inability to adjust to confinement, posing a threat to the safety and security of the community, staff and/or other inmates. (*Id.* at ¶¶ 18-19). As such, Northern housed and managed many inmates who were on "Restrictive Statuses" pursuant to Administrative Directive ("AD") 9.4, including inmates on special needs. (*Id.* at ¶ 20). Pursuant to AD 9.4, special needs is a status "[f]or inmates who have demonstrated behavioral qualities either through the serious nature of their crime, behavior or reasonable belief that they continue to pose a threat to the safety and security of staff, other inmates, themselves, or the public." (*Id.* at ¶ 21).

In 2017 and 2018, Northern had a classification committee, which was a committee that met, in person, approximately once per month, to review and discuss inmates assigned to restrictive statuses at Northern. (*Id.* at ¶ 25). This committee was comprised of staff from Northern, including the Warden, Deputy Warden, Unit Manager(s), Counselor Supervisors, Unit Counselors, and other staff with relevant information concerning an inmate's classification or confinement. (*Id.* at ¶ 26). The committee also included mental health staff, including a psychologist and/or psychiatrist. (*Id.* at ¶ 27).

The purpose of these classification meetings was to determine whether an inmate's confinement on a particular status continued to be warranted, as well as to determine whether any conditions of their confinement, including privileges or restrictions, should be adjusted based on recent conduct, behavior, or needs.[3] (*Id.* at ¶¶ 28, 32). The committee would review the inmate's recent institutional records, including recent disciplinary reports, and would discuss any recent observations, interactions, or incidents involving the inmate at issue. (*Id.* at ¶ 29). Mental health staff would also provide input concerning the inmate's mental health status, any ongoing treatments, and any recent interactions they had. (*Id.* at ¶ 30). If mental health staff had any concerns regarding an inmate's classification or confinement, such concerns would be discussed and appropriately addressed. (*Id.*).

### C.  The Plaintiff's Classification & Confinement

The plaintiff has a significant disciplinary history within DOC and required a lot of resources to manage given his behavior and disciplinary issues. (*Id.* at ¶ 34). Indeed, as of August 1, 2017, the plaintiff had accumulated approximately 285 disciplinary reports ("DR") for a wide range of offenses. (*Id.*). On November 7, 2014, after notice and a hearing, the plaintiff was placed on special needs "[f]or the safety and security of staff, inmates, and the department[,]" due to having "an extensive disruptive history that requires him to be maintained on a highly restrictive status . . . . [as well as an] unwilling[ness] to participate in the Administrative Segregation, which is demonstrated by him

---

[3] Inmates would receive notice of these reviews occurring through the issuance of a  "Classification Review Sheet," which included any changes to their classification/conditions based on the review.  (Def. L. R. 56(a)(1) Statement, ¶ 33).

4

accumulating over 100 disciplinary reports." (*Id.* at ¶ 35). None of the defendants in this case were involved in the plaintiff's initial placement on special needs. (*Id.* at ¶ 36).

From April 24, 2017 until August 1, 2017, the plaintiff was housed at the Hartford Correctional Center ("HCC"). (*Id.* at ¶ 37). The plaintiff was transferred to HCC in an attempt to reintegrate him back into the general inmate population. (*Id.*). On August 1, 2017, however, the plaintiff transferred back to Northern due to picking up a DR at HCC on July 31, 2017 for interfering with safety and security and based on indications from the HCC administration that he was causing disruptions and interfering with the safety, security, and operations of that facility. (*Id.* at ¶ 38). The plaintiff was housed at Northern in a single-cell in the 1-West Housing Unit from August 1, 2017 until May 9, 2018, at which time he transferred to the general inmate population at MWCI. (*Id.* at ¶¶ 39-40, 65).

There were several staff members assigned to, and stationed in, 1-West during each shift. (*Id.* at ¶¶ 42-46). During first shift, which was from 7am until 3pm, there were at least 5 officers assigned to the unit, as well as 1 officer assigned to the control bubble in the unit. (*Id.* at ¶ 43). The officers assigned to 1-West were required to the tour the unit every 15 minutes and would regularly speak with inmates during their tours. (*Id.*). During second shift, which was from 3pm until 11pm, there were at least 4 officers assigned to 1-West, as well as 1 officer in the control bubble. (*Id.* at ¶ 45). During third shift, which was from 11pm until 7am, there was at least 1 officer assigned to the unit, as well as 1 officer in the control bubble. (*Id.* at ¶ 46). The officers assigned to 1-West during second and third shift were also required to the tour the unit every 15 minutes. (*Id.* at ¶ 47).

Mental health and medical staff would also tour 1-West at least once per shift, Monday through Friday, and would tour at least once on first and second shift on Saturdays and Sundays. (*Id.* at ¶ 48). Lieutenants would tour at least twice per shift, and Unit Managers would tour at least once per shift, and would regularly speak with inmates during these tours. (*Id.* at ¶ 49). The Warden and Deputy Warden would also tour at least twice per week, and chaplains would tour on a weekly basis. (*Id.* at ¶

50). Inmates in 1-West also had access to the inmate request system, which allowed them to submit requests to see certain staff, including medical or mental health, as needed. (*Id.* at ¶ 51).

It was also common for inmates in 1-West, including the plaintiff, to regularly speak with inmates in the surrounding cells. (*Id.* at ¶¶ 52-53). While on special needs, the plaintiff was permitted at least two-hours of recreation per day, six-days per week, which occurred in the outdoor recreation yard. (*Id.* at ¶ 54). The plaintiff was permitted to have a minimum of three one-hour social visits per week and legal visits as needed, and was also permitted at least three fifteen-minute phone calls per week and could send and receive mail.[4] (*Id.* at ¶ 55).

Between August 1, 2017 and May 9, 2018, the plaintiff's status on special needs was reviewed by the classification committee at Northern, including on the following dates: August 29, 2017, September 26, 2017, October 26, 2016, November 28, 2017, December 28, 2017, February 27, 2018, and March 27, 2018, at which time the plaintiff was recommended for removal from special needs. (*Id.* at ¶ 57). During these reviews, changes were made to the plaintiff's conditions, including removing him off a restraint status and recommending his removal from special needs. (*Id.* at ¶¶ 61-62). Indeed, between August 1, 2017 and August 29, 2017, the plaintiff was placed on a restraint status, meaning he was placed in restraints during routine movements outside of his cell. (*Id.* at ¶ 58). This condition was briefly imposed on the plaintiff upon his arrival to Northern due to his recent disciplinary and behavioral issues at HCC and is tool used for the protection of staff and inmates, as well as to maintain safety, security, and order within the facility. (*Id.* at ¶ 59). However, on August 29, 2017, when the committee undertook its first review of the plaintiff's status after his transfer to Northern on August 1, 2017, it was determined that he would be removed off restraint status.[5] (*Id.* at ¶ 61).

---

[4] The plaintiff may have temporarily lost certain privileges during this time, such as phone calls, based on sanctions imposed on him for pleading guilty to disciplinary infractions; however, an inmate at Northern would never lose visiting privileges and phone privileges at the same time. (Def. L. R. 56(a)(1) Statement, ¶ 56).

[5] During the classification reviews, the committee would review inmates on a restraint status to determine if that condition continued to be warranted based on the inmate's recent conduct and behavior, and when such a condition was no longer determined to be necessary, inmates would have that condition removed. (Def. L. R. 56(a)(1) Statement, ¶ 60).

During the committee's March 2018 review of the plaintiff's status, it was determined that he "demonstrated behavioral qualities that do not continue to pose a threat to the safety and security of staff, other inmates, himself, or the public" and it was recommended that he "be removed from Special Needs status and managed in a general population setting." (*Id.* at ¶ 62). Thereafter, the plaintiff was removed off special needs on April 26, 2018. (*Id.* at ¶¶ 63-64).

Semple, Quiros, Mulligan, and Maiga were not involved in any of the reviews of the plaintiff's status on special needs between August 1, 2017 and May 9, 2018, as such reviews were conducted by staff at Northern. (*Id.* at ¶¶ 66). Likewise, Faneuff did not participate in any of these reviews after October 13, 2017, when he became the Warden at Osborn. (*Id.* at ¶ 67). At no point during any of the committee's reviews of the plaintiff's status on special needs during the relevant time, were any concerns raised by mental health staff regarding the plaintiff's mental health status, or that his conditions of confinement posed a risk of serious harm to his mental or physical health. (*Id.* at ¶ 68). In the event any such concerns were raised, custody staff, including Faneuff, Molden, and Robles, would have deferred to mental health staff as to the appropriate actions to be taken. (*Id.* at ¶ 69).

## II.     SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if," as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). However, the nonmoving party cannot "rely on conclusory allegations or unsubstantiated speculation, but must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 43 (2d Cir. 2015) (citation omitted).

# III.   DISCUSSION

## A. Qualified Immunity

As an initial matter, the defendants contend that they are entitled to qualified immunity as to each of the plaintiff's claims; however, because they put forth separate qualified immunity arguments for each claim remaining in the case, they provide the qualified immunity standard at the outset.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). To overcome qualified immunity, a plaintiff must show that (1) the defendant violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct. *Taylor v. Barkes*, 135 S. Ct 2042, 2044 (2015) (citations omitted).

In the qualified immunity context, a right is "clearly established" if, at the time of the challenged conduct, it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam). "To be clearly established, a legal principle must have a sufficiently clear founding in then-existing precedent [and] [t]he rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018).

The Supreme Court has recently, and repeatedly, instructed lower courts "not to define clearly established law at a high level of generality." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (citation omitted). Rather, "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation omitted). The qualified immunity analysis must be "particularized" in the sense that "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Doninger v. Neihoff*, 642 F.3d 334, 345-46 (2d Cir. 2011). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know

about the constitutionality of the conduct." *Id*. at 345. "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308

Under the second prong of the qualified immunity analysis, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Taravella v. Town of Wolcott,* 599 F.3d 129, 134 (2d Cir. 2010). That is because qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *Distiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (citation omitted).

As detailed below, the defendants are entitled to qualified immunity as the plaintiff cannot establish a constitutional violation. They are further entitled to qualified immunity as, given the status of the law at time of the relevant conduct in this case, 2017 and 2018, the defendants' actions in this case were objectively reasonable and did not violate any clearly established right of the plaintiff.

## B. Personal Involvement

Because the defendants are supervisory prison officials, it is important to note that the plaintiff must establish the personal involvement of each defendant in the alleged constitutional violation. *Spavone v. New York State Dept. of Corr. Services*, 719 F.3d 127, 135 (2d Cir. 2013). The plaintiff, however, may not rely on a special test to establish their liability, but rather "must . . . prove the elements of the underlying constitutional violation *directly* against the official without relying on a special test for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020) (emphasis added). In other words, "[t]he violation must be established against the supervisory official directly." *Id*.

Here, given the relevant time frame of the plaintiff's claims, which relate to his classification and confinement at Northern on special needs between August 1, 2017 and May 9, 2018, the plaintiff cannot establish the personal involvement of Mulligan, Semple, Maiga, Quiros, or Faneuff (at certain times).

### Defendant Mulligan

At no point between August 1, 2017 and May 9, 2018, was Mulligan stationed at Northern. As of March 31, 2017, Mulligan was the Warden at MWCI and was stationed at that facility, where he remained until March 29, 2019. (Def. L. R. 56(a)(1) Statement, ¶ 11). As such, during the relevant time, Mulligan did not have direct control over or involvement in the conditions of confinement at Northern, nor did he have any involvement in the reviews of the plaintiff's status on special needs, as such reviews were conducted by staff at Northern. (*Id.* at ¶ 66). Accordingly, the plaintiff cannot establish Mulligan's personal involvement and judgment must enter in his favor.

### Defendant Semple

During the plaintiff's confinement at Northern between August 1, 2017 and May 9, 2018, Semple served as DOC's Commissioner, and in that position, he was not stationed at Northern as his office was at DOC's Central Office. (*Id.* at ¶¶ 3-4). As such, Semple did not have direct control over or involvement in the conditions of confinement at Northern,[6] nor was he involved in the reviews of the plaintiff's status, as such reviews were conducted by staff at Northern. (*Id.* at ¶ 66). Accordingly, the plaintiff cannot establish Semple's personal involvement and judgment must enter in his favor.

### Defendant Quiros

During the plaintiff's confinement at Northern between August 1, 2017 and May 9, 2018, Quiros served as District Administrator for District 1, which included several facilities, including Northern. (*Id.* at ¶ 5). In that position, Quiros was not stationed at Northern as his office was in Suffield. (*Id.* at ¶¶ 6-7). As such, Quiros had no direct involvement with the day-to-day operations of Northern, including the plaintiff's conditions of confinement, nor was he involved in the reviews of the plaintiff's

---

[6] In fact, the plaintiff conceded at his deposition that he "didn't see Semple at Northern" and that the "only [he] saw Semple was when [he] was in Hartford." (Ex. A, Excerpts from Transcript of Deposition of Daniel Riles, p. 140:17-19).

status on special needs, as such reviews were conducted by staff at Northern. (*Id.* at ¶¶ 7, 66). As such, the plaintiff cannot establish Quiros's personal involvement and judgment must enter in his favor.

### Defendant Maiga

Maiga served as Director of OCPM during the plaintiff's confinement at Northern between August 1, 2017 and May 9, 2018. (*Id.* at ¶ 8). In that position, Maiga was not stationed at Northern, nor did he have direct control over or involvement in the conditions at Northern, as his office was in Suffield. (*Id.* at ¶ 9-10). Similarly, Maiga was not involved in the reviews of the plaintiff's status on special needs, as such reviews were conducted by staff at Northern.[7] (*Id.* at ¶ 66). Accordingly, the plaintiff cannot establish Maiga's personal involvement and judgment must enter in his favor.

### Defendant Faneuff

The plaintiff cannot establish Faneuff's personal involvement in any alleged constitutional violation after October 13, 2017, as he became the Warden at Osborn on that date and was stationed at that facility until his retirement on March 1, 2018. (*Id.* at ¶ 12). As such, Faneuff did not have direct control over or involvement in the conditions of confinement at Northern after October 13, 2017, nor did he have any involvement in the reviews of the plaintiff's status after that date. (*Id.* at ¶ 12, 67).

### Qualified Immunity

Finally, to the extent that the plaintiff seeks to hold the supervisory defendants in this case liable based on their position in the prison hierarchy or based on any theory of liability other than by establishing the elements of his Eighth and Fourteenth Amendment claims against that defendant *directly*, they are entitled to qualified immunity, as the scope of supervisory liability under § 1983 for violations of the Eighth or Fourteenth Amendment, if any, was not clearly established at the time of the underlying conduct in this case. The *Tangreti* decision is instructive on this point, as the Second Circuit determined that a supervisory official was entitled to qualified immunity because "the scope of supervisory liability under § 1983 for violations of the Eighth Amendment was not clearly established

---

[7] To be clear, Maiga, as OCPM Director, would approve or deny recommendation for an inmate' removal from special needs; however, such recommendations were made by facility staff. (Ex. E, Declaration of David Maiga, ¶¶ 8-10).

at the time of the relevant conduct." *Tangreti*, 983 F.3d at 620. In granting qualified immunity to the supervisory official in *Tangreti*, the Second Circuit acknowledged that the supervisory liability standard set forth in *Colon* had been called into question since *Iqbal* and that District Court's in this Circuit have reached inconsistent results as it relates to the effect of *Iqbal* on supervisory liability. *Id*. at 617 n. 3. Given the Second Circuit's decision in *Tangreti*, which was issued on December 28, 2020, it cannot be said that the scope of liability of a supervisory official, if any, was clearly established at the time of the relevant conduct. Therefore, to the extent the plaintiff attempts to rely on any theory of liability other than by establishing the elements of his claims against the defendants *directly*, they are entitled to qualified immunity as the Second Circuit has not decided a case that would establish the parameters of such a constitutional claim against a supervisory prison official. *See Wesby*, 138 S. Ct. at 589-90.

## C. Fourteenth Amendment Procedural Due Process Claim

As previously noted, the plaintiff's due process claim arises from the alleged lack of meaningful reviews of his status on special needs between August 1, 2017 and April 26, 2018, when he was removed from that status. Judgment must enter in the defendants' favor, as the plaintiff cannot establish a procedural due process claim, and alternatively, the defendants are entitled to qualified immunity.

i. **The plaintiff cannot establish a due process claim based on the alleged lack of meaningful periodic reviews of his status on special needs between August 1, 2017 and April 26, 2018.**

Because the plaintiff's initial placement on special needs is not at issue, the defendants only lay out the due process requirements for the periodic review of inmates on restrictive administrative statuses. Once an inmate has been placed on such a status, "*Hewitt* mandates that prison officials 'engage in some sort of periodic review of the confinement' to verify that the inmate 'remains a security risk' throughout this term." *Proctor v. LeClaire*, 846 F. 3d 597, 609 (2d Cir. 2017) (quoting *Hewitt v. Helms*, 459 U.S. 460, 477 n. 9 (1983)); *see also Ford v. Deacon*, 793 Fed. Appx. 13, 17 (2d Cir. 2019). The Second Circuit has "enumerated three criteria for that periodic administrative review to satisfy *Hewitt* and the Due Process Clause: The review must (1) meaningfully evaluate, (2) considering recent

conduct, (3) whether valid institutional safety reasons justify continued segregation." *H'Shaka v. O'Gorman*, 758 Fed. Appx. 196, 199 (2d Cir. 2019) (citing *Proctor*, 846 F.3d at 610-11).

"The purpose of these periodic reviews is to ensure that the state's institutional interest justifying the deprivation of the confined inmate's liberty has not grown stale and that prison officials are not using Ad Seg as 'a pretext for indefinite confinement of an inmate.'" *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 477 n. 9). These reviews, however, are "flexible and may be based on 'a wide range of administrative considerations,' including but not limited to observations of the inmate in Ad Seg, 'general knowledge of prison conditions,' misconduct charges, ongoing tensions in the prison, and any ongoing investigations." *Id.* (citation omitted). Importantly, "procedural due process does not permit a court to review the substance of [prison officials'] decision to confine [a prisoner] in Ad Seg . . . [as] [t]he Due Process Clause permits only an evaluation of whether Defendants' method for coming to their Ad Seg determination is sufficient." *H'Shaka*, 758 Fed. Appx. at 199 (quoting *Proctor* 846 F.3d at 610-11). Moreover, "Courts must preserve prison officials' 'freedom to take appropriate action to ensure the safety of inmates and corrections personnel . . . . [and] [p]rison administrators therefore should be accorded wide-ranging deference in the adoption of and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Proctor*, 846 F.3d at 610 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

Here, the plaintiff cannot maintain a due process claim arising from any purported lack of meaningful reviews of his status on special needs between August 1, 2017 and April 26, 2018. As an initial matter, AD 9.4 provides that inmates on special needs shall have a classification hearing/review at a minimum of every six months. (Def. L. R. 56(a)(1) Statement, ¶ 22). The evidence establishes that the plaintiff's status on special needs was reviewed far more frequently than required by AD 9.4.

Indeed, after the plaintiff's transfer on August 1, 2017,[8] his status was reviewed by the classification committee at Northern on August 29, 2017, September 26, 2017, October 26, 2017, November 28, 2017, December 28, 2017, February 27, 2018, and March 27, 2018, at which time the plaintiff was recommended for removal from special needs. (*Id.* at ¶ 57). Such intervals of periodic reviews are consistent with due process requirements. *See Ford*, 793 Fed. Appx. at 18-19 (finding no due process violation based on periodic review with interval of 105 days); *Brown v. Dep't of Corr.*, No. 3:16-CV-376 (WIG), 2021 U.S. Dist. LEXIS 6077, at *34 (D. Conn. Jan. 13, 2021) ("District Courts in this circuit have held that periodic reviews every four months is consistent with due process requirements . . . .") (citing cases). Therefore, to the extent the plaintiff's claim is that such periodic reviews were not held frequently enough, such a claim must fail.

The evidence further reveals that these reviews were "meaningful." Indeed, Northern had a classification committee consisting of the Warden, Deputy Warden, Unit Manager(s), Counselor Supervisors, Unit Counselors, and other staff with relevant information. (Def. L. R. 56(a)(1) Statement, ¶ 26). The committee also included mental health staff, including a psychologist and/or psychiatrist. (*Id.* at ¶ 27). The committee would meet, in person, once per month, to review and discuss inmates assigned to restrictive statuses at Northern to determine whether an inmate's classification on a particular status continued to be warranted, as well as to determine whether any specific conditions of their confinement should be adjusted based on recent conduct, behavior, or needs. (*Id.* at ¶¶ 25, 28). The committee would review the inmate's recent institutional records, including recent DRs, and discuss any recent observations, interactions, or incidents involving the inmate. (*Id.* at ¶ 29). Mental health staff would provide input concerning the inmate's mental health status, any ongoing treatments, and any recent interactions they had. (*Id.* at ¶ 30). In short, the purpose of these reviews was not only

---

[8] It is also important to note that the plaintiff transferred to Northern due to picking up a DR at HCC for interfering with safety and security and indications from the administration at HCC that the plaintiff was causing disruptions and interfering with the safety, security, and operations of that facility. (Def. L. R. 56(a)(1) Statement, ¶ 38).

to determine whether an inmate's confinement on a particular status was still warranted, but also to determine whether any conditions should be adjusted based on recent conduct, behavior or needs.

There can be no dispute that the reviews held at Northern by the classification committee, as detailed above, complied with the requirements of *Proctor*, including meaningfully evaluating whether an inmate's continued confinement on a particular status, as well as their conditions of confinement, were reasonably necessary in light of that inmate's recent conduct. Nor can there be any dispute that the plaintiff's classification reviews were conducted in accordance with this process. In fact, the evidence establishes that based on reviews of the plaintiff's classification during the relevant time, his conditions were adjusted, and he was ultimately recommended for removal from special needs.

Indeed, on August 29, 2017, when the committee undertook its first review of the plaintiff's status, only four weeks after his transfer to Northern, it was determined that he would be removed off restraint status,[9] which meant that he would not be placed in restraints during routine movements outside of his cell.[10] (*Id.* at ¶ 61). Additionally, during the committee's March 2018 review of the plaintiff's status, it was determined that he "demonstrated behavioral qualities that do not continue to pose a threat to the safety and security of staff, other inmates, himself, or the public" and he was recommended for removal from special needs. (*Id.* at ¶ 62). Thereafter, the removal request was approved, and the plaintiff was removed from special needs on April 26, 2018. (*Id.* at ¶¶ 63-64).

The above evidence demonstrates, not only that the plaintiff's confinement on special needs was periodically reviewed, but also that the reviews were "meaningful" as they resulted, not only in adjustments to his conditions, but also in his removal from special needs. This does not constitute a procedural due process violation. This is especially so, given that the plaintiff's transfer to Northern

---

[9] Between August 1, 2017 and August 29, 2017, the plaintiff was placed on a restraint status, and this condition was briefly imposed upon his arrival to Northern due to his recent disciplinary issues at HCC and is a tool used for the protection of staff and inmates, as well as to maintain safety, security, and order in the facility. (Def. L. R. 56(a)(1) Statement, ¶¶ 58-59).

[10] During the monthly classification reviews, the committee would review inmates on a restraint status to determine if that condition continued to be warranted based on the inmate's recent conduct and behavior, and when such a condition was no longer determined to be necessary, inmates would have that condition removed. (Def. L. R. 56(a)(1) Statement, ¶ 60).

and continued confinement on special needs on August 1, 2017 was the result of recent misconduct which, in the eyes of non-party correctional officials, posed a threat to safety, security, and order at HCC. (*Id.* at ¶ 38). Importantly, once the plaintiff transferred to Northern, his status was meaningfully reviewed, which resulted in adjustments to his conditions and ultimately his removal from special needs a few months later. And as previously noted, "procedural due process does not permit a court to review the substance of [prison officials'] decision to confine [a prisoner] in Ad Seg[,]" *H'Shaka*, 758 Fed. Appx. at 199, and "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption of and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Proctor*, 846 F.3d at 610.

In short, the plaintiff cannot maintain his procedural due process claim as the evidence establishes that his status on special needs was meaningfully and periodically reviewed in accordance with the requirements of the Due Process Clause. Accordingly, judgment must enter in favor of the defendants.

### ii. Alternatively, the defendants are entitled to qualified immunity.

The defendants are entitled to qualified immunity as the plaintiff has failed to establish a constitutional violation, as detailed above. *See Taylor*, 135 S. Ct. at 2044. The defendants are further entitled to qualified immunity as, given the status of the law cited above, no reasonable correctional official would believe they were violating any of the plaintiff's clearly established due process rights by conducting reviews of his status, approximately every month. Moreover, as detailed above, these periodic reviews were conducted by a multi-disciplinary team of correctional and mental health staff, who reviewed the plaintiff's recent conduct to determine whether his confinement on special needs was still warranted and whether his current conditions should be adjusted. Given the status of the law, no reasonable correctional official would believe that such actions would violate any of the plaintiff's clearly established rights, and to the extent the plaintiff's claim is that the classification committee should have considered specific criteria or conducted the reviews in a particular manner, including permitting the plaintiff to attend these reviews, the defendants are entitled to qualified immunity.

There is no case from the Second Circuit or Supreme Court clearly establishing a prisoner's due process right to notice of or to attend a periodic review, or to present evidence at such a review. To the contrary, courts in this Circuit, as recently as 2020, have found that inmates, like the plaintiff, have no such due process right, let alone a clearly established one. *See Vail v. Bellnier*, No. 9:19-CV-34 (GLS/ML), 2020 U.S. Dist. LEXIS 105652, at *21-22 (N.D.N.Y. June 15, 2020) (finding that "[t]here is no support in *Hewitt* for Plaintiff's allegations that due process requires he receive notice of periodic reviews" and "*Hewitt* specifically held that there need be no requirement that administrative segregation inmates submit evidence or statements to the committee" and further noting that "the tenets of due process do not mandate that an inmate is entitled to the decisions of reviews, the identity of the reviewers, or information regarding what is needed to be released from administrative confinement") (citing cases), *report and recommendation adopted*, *Vail v. O'Gorman*, 2020 U.S. Dist. LEXIS 176158 (N.D.N.Y. Sept. 25, 2020). As such, the defendants are entitled to qualified immunity.

### D. Eighth Amendment Claim

As previously noted, the Court has limited the timeframe and scope of the plaintiff's Eighth Amendment claim to his confinement at Northern between August 1, 2017 and May 9, 2018, and which relate to his confinement in a small cell for most of each day, his lack of access to programming, his lack of contact with the outside world, and being placed in full restraints outside of his cell. As detailed below, judgment must enter in favor of the defendants, as the plaintiff's Eighth Amendment claim fails as a matter of law, and alternatively, the defendants are entitled to qualified immunity.

To prevail on his Eighth Amendment claim in this case, the plaintiff must establish both an objective and subjective component. *See Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

### Objective Prong

To satisfy the objective prong, the plaintiff must show that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life necessity" or a "substantial risk of serious harm" to his health. *Id*. at 834. "This can be shown if an inmate is deprived

of 'basic human needs such as food, clothing, medical care, and safe and sanitary living conditions.'" *Walker v. Quiros*, No. 3:11-CV-82 (MPS), 2014 U.S. Dist. LEXIS 179486, at *10 (D. Conn. Sept. 30, 2014) (citation omitted). In this case, there is no claim that the plaintiff was deprived of any of these basic needs, as his claims are limited to his confinement in a cell for most of the day, the lack of programming, the lack of contact with the outside world, and being restrained while outside of his cell.

It is important to note, however, that "the Constitution does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). In the context of a prisoner's confinement, those conditions that are "restrictive or even harsh" do not violate the Eighth Amendment because "they are part of the penalty that criminal offenders pay for their offenses against society." *Id*. at 347. There is "[n]o static 'test' . . . by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id*. at 346 (citation omitted). In making such determinations, however, the Supreme Court has made clear that "'Eighth Amendment judgments should neither be nor appear to be merely the subjective views' of judges . . . .[b]ut such 'judgments should be informed by objective factors to the maximum possible extent.'" *Id*. (citation omitted). To that point, the Supreme Court has repeatedly instructed lower courts to afford prison officials appropriate deference and not to substitute their own judgments on how to best operate a prison for those of prison administrators. Indeed, in *Procunier v. Martinez*, the Supreme Court stated:

> Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism.

416 U.S. 396, 404-405 (1974), *overruled in part on other grounds*, *Thornburgh v. Abbot,* 490 U.S. 401 (1989); *see also McKune v. Lile*, 536 U.S. 24, 37 (2002) ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government . . . . To respect these imperatives, courts must exercise restraint in supervising the minutiae of prison life.").

Importantly, "[i]n assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries 'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how to best operate a [prison] facility.'" *Rhodes*, 452 U.S. at 351 (quoting *Bell*, 441 U.S. at 539). As detailed below, the plaintiff cannot establish that the conditions imposed on him (*i.e.,* confinement to a cell for most of the day, lack of programing, lack of contact with outside world, or being restrained outside of his cell) during his 9-month confinement at Northern between August 1, 2017 and May 9, 2018 satisfy the objective prong.

### Subjective Prong

To satisfy the subjective prong, the plaintiff must establish that the defendant official had a "sufficiently culpable state of mind[,]" that is, "one of deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Deliberate indifference is a "mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citation omitted). This requires that the charged official "act or fail to act while actually aware of a substantial risk that serious inmate harm will result," which necessitates showing more than "merely negligent" conduct. *Id*. Thus, the official must have been actually aware of a substantial risk that serious harm would result due to the official's actions or inactions, and that he disregarded that risk. *Id*. at 279-80. Moreover, a defendant's "belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere." *Id.* at 281.

Importantly, "[f]or an Eighth Amendment complaint to survive summary judgment, a plaintiff must point to actual evidence in the record permitting the inference that Defendants acted with

deliberate indifference; he cannot rely on conjecture or speculation." *Walker*, 2014 U.S. Dist. LEXIS 179486, at *10-11 (internal quotation marks & citation omitted). As more fully detailed below, the plaintiff cannot establish that any defendant acted with deliberate indifference to his conditions of confinement at Northern between August 1, 2017 and May 9, 2018. The defendants separately address, below, each of the four conditions the plaintiff is permitted to challenge in this case.

### i. <u>Confinement Alone in a Cell</u>

The plaintiff claims that his confinement alone in a cell for most of each day, which he alleges is "solitary confinement," violates the Eighth Amendment. As previously noted, this claim arises from the plaintiff's confinement at Northern from August 1, 2017 until May 9, 2018, and during this time, he was housed in a single-cell.[11] (Def. L. R. 56(a)(1) Statement, ¶ 40). In other words, the plaintiff's confinement "alone in a cell" at Northern lasted for 281 days, or approximately 9-months. As detailed below, the plaintiff's claim must fail as he cannot establish that confinement alone in a cell for most of each day constitutes a "sufficiently serious deprivation," nor can he establish that such confinement exposed him to a substantial risk of serious harm that any defendant was deliberately indifferent to.

### a. Objective Prong

As an initial matter, "[t]wenty-three hours of confinement [in a cell] does not itself constitute an objectively serious deprivation." *Davis v. Rinaldi,* No. 3:19-CV-504 (CSH), 2019 U.S. Dist. LEXIS 215346, at *24 (D. Conn. Oct. 31, 2019); *see also Mercado v. Dep't of Corr.*, No. 3:16-CV-1622 (VLB), 2017 U.S. Dist. LEXIS 41881, at *15 (D. Conn. Mar. 23, 2017) ("Although the Plaintiff complains about confinement in his cell . . . for twenty-three hours a day, that type of confinement in and of itself does not rise to the level of an Eighth Amendment violation."). In fact, numerous courts within this District, including this Court, have found that being "confined to a cell for 23 hours per day" along with various other restrictive conditions for extended periods of time, including up to two

---

[11] Notably, single-cell status is a preferred housing status within DOC and many inmates prefer living in a single cell, and many times will misbehave or act out in ways that tries to get themselves placed in a single-cell. (Ex. C, ¶ 31; Ex. G, ¶ 28).

years, does not deprive an inmate "of any basic human need, and therefore are not unconstitutional." *Doyle v. Santiago*, No. 3:19-CV-901 (MPS), 2019 U.S. Dist. LEXIS 181125, at *20-21 (D. Conn. Oct. 18, 2019) (dismissing on initial review a prisoner's Eighth Amendment claim concerning his two-year confinement in the SRG program, finding that "[a]lthough the conditions described may be harsh," including, *inter alia*, "confined to a cell for 23 hours per day; only one hour of outdoor recreation per weekday; no, or limited, indoor recreation; . . . [and] no programming" they "do not deprive the plaintiff of any basic human need, and therefore, are not unconstitutional"); *see also Pagan v. Dougherty*, No. 3:18-CV-1668 (VLB), 2019 U.S. Dist. LEXIS 106786, at *8, 14-15 (D. Conn. June 26, 2019) (finding inmates placement in segregation for two years in SRG program at Northern whereby "he [was] confined in his cell 23 to 24 hours per day" and was deprived of phone privileges, visits, and access to programs and services "do not support an Eighth Amendment claim for inhumane conditions of confinement") (citing cases); *Davis,* 2019 U.S. Dist. LEXIS 215346, at *23-26 (dismissing Eighth Amendment claim arising from confinement for "five months in administrative segregation at Northern . . . [which] entailed twenty-three hours of confinement within his cell and allowed only one hour of exercise" finding that such conditions did not constitute an objectively serious deprivation).

Moreover, while "[c]ourts have found that isolation and solitary confinement, when extended, can sometimes constitute cruel and unusual punishment under the Eighth Amendment[,]" *Conley v. Aldi*, No. 3:18-CV-824 (VAB), 2020 U.S. Dist. LEXIS 49534, at *16 (D. Conn. Mar. 23, 2020), such cases have involved inmates confined to such conditions continuously for periods of years, not months as in this case. *See, e.g., Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019) ("The challenged conditions of confinement on Virginia's death row—under which Plaintiffs spent, *for years*, between 23 and 24 hours a day alone, in a cell with no access to congregate religious, educational, or social programming—pose a substantial risk of serious psychological and emotional harm.") (emphasis added); *Johnson v. Wetzel*, 209 F. Supp.3d 766, 777-78 (M.D. Pa. 2016) (finding confinement in cell

for 23 to 24 hours per day, among other conditions, "[r]eplicated daily *for thirty-six years* . . . comprise an unconstitutional deprivation.") (emphasis added); *H'Shaka*, 444 F. Supp.3d at 379 (finding that inmate "subjected to the conditions of SHU/Ad Seg for approximately *23 years*" created a "genuine question of material fact regarding whether Plaintiff was deprived of at least one basic human need as a result of *the long duration of his confinement* . . . .") (emphasis added). These cases are distinguishable not only because of the length of confinement (months vs. decades), but also because the prisoner in each of those cases was placed in such confinement based on receiving a death sentence,[12] or based on a remote history of disciplinary violations,[13] not based on consistent and recent disciplinary issues as in this case. (Def. L. R. 56(a)(1) Statement, ¶¶ 34-35, 38).

Additionally, there is no dispute that the plaintiff's confinement alone in a cell at Northern for 9-months did not deprive him of any basic human need. Indeed, in addition to the plaintiff not being able to raise claims concerning certain conditions given his failure to exhaust, the plaintiff testified that "[a]ll of these things have been provided for me: Food, clothing, shelter, heat, hot water, tissue, clothing, whatever recreation." (Ex. A, p. 126:7-10). In addition, while the plaintiff claims that he was deprived of social contact during his confinement at Northern, the uncontroverted evidence indicates otherwise. In fact, during this time, the plaintiff admittedly spoke with the inmates housed in the surrounding cells "every day." (Def. L. R. 56(a)(1) Statement, ¶ 53). The plaintiff testified that he would speak to these inmates about "[c]urrent events, the prison environment, prisoners, DOC employees, religion, politics, history." (*Id.*). In addition to these regular conversations with other inmates, the evidence also establishes that staff, including officers, counselors, correctional

---

[12] *See Porter*, 923 F.3d at 359 ("[T]he challenged Virginia procedures and regulations place death row inmates in solitary confinement *based on their sentence alone*.") (emphasis added).

[13] *See Johnson*, 209 F. Supp.3d at 777, 780 (finding violation where inmate had been discipline-free for the most recent 25 years of his 36-year period of isolated confinement, yet defendants continued to justify that confinement based on his remote history of assaults and escape attempts); *H'Shaka*, 444 F. Supp.3d at 379 (finding question of material fact regarding Eighth Amendment conditions claim where "Plaintiff had been subjected to SHU conditions for [23 years] . . . [and] ha[d] not engaged in the type of violent behavior that initially justified his placement in the SHU . . . in 2010").

supervisors, mental health clinicians, medical staff, and chaplains, regularly toured the plaintiff's housing unit continuously throughout each day, and the plaintiff could, and did, engage in conversation or social interaction with these individuals. (*Id.* at ¶¶ 42-50). Moreover, on special needs, the plaintiff was permitted a minimum of three one-hour social visits per week, legal visits as needed, a minimum of three fifteen-minute phone calls per week and could send and receive mail. (*Id.* at ¶¶ 54-55). In short, the evidence establishes that the plaintiff was not deprived of any basic human need during his 9-month confinement at Northern. In fact, the plaintiff has no actual injury whatsoever based on his confinement alone in a cell. *See Wright v. Levitt*, No. 13-CV-563 (FPG), 2022 U.S. Dist. LEXIS 25151, at *8 (W.D.N.Y. Feb. 11, 2022) ("Plaintiff's alleged isolation, solitary confinement, and other harsh consequences do not qualify as 'physical injury' under § 1997e(e).")[14] (citing cases).

Finally, there can be no dispute that the confinement the plaintiff experienced for 9-months at Northern did not violate standards of decency in 2017 and 2018, and in fact, was, and still is, a common practice of corrections officials in jurisdictions across the country. Indeed, the Arthur Liman Institute for Public Interest Law at Yale Law School published a report in 2020 entitled "Time-In-Cell 2019: A Snapshot of Restrictive Housing,"[15] which included a survey of the use of "restrictive housing" in prison systems across the United States.[16] This survey demonstrates that in 2017, at least 33 jurisdictions/states[17] utilized the type of confinement at issue in this case. *See* (Ex. M, p. 6-7). The survey further demonstrates that at least 30 jurisdictions utilized this type of confinement in 2019, a

---

[14] 42 U.S.C. § 1997e (e) provides that: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act . . . ."

[15] The report published by the Liman Institute is a total of 241 pages, and the defendants have included in Exhibit M, the relevant portions of the report cited and discussed in this brief. The page numbers cited in Exhibit M refer to the page numbers generated by PACER. The full report can be accessed at Time-In-Cell 2019 - Yale Law School.

[16] The survey "defined the term 'restrictive housing' (often called 'solitary confinement') as the placement of an individual in a cell for an average of at least twenty-two hours per day for fifteen or more continuous days." (Ex. M, p. 5). Notably, this is the same type of confinement alleged by the plaintiff in this case, (*i.e.*, spending 22-23 hours per day in a cell for more than 15 consecutive days). *See* (ECF No. 21, ¶¶ 2, 30, 58).

[17] Only 39 jurisdictions were surveyed in the Liman Report. (Ex. M, p. 4).

year after the conduct at issue in this case. (*Id.*). In fact, most of these jurisdictions, in both 2017 and 2019, had hundreds, if not thousands, of inmates in such confinement. (*Id.*). What's more, in 2017, 22 jurisdictions housed inmates in restrictive housing for periods of 181 and 365 days, 20 jurisdictions housed inmates for periods of 1 to 3 years, and 19 jurisdictions housed inmates for periods greater than 3 years. (*Id.* at 8). The data is similar for 2019, a year after the conduct in this case, as 20 jurisdictions housed inmates in restrictive housing for periods of 181 and 365 days, 19 jurisdictions housed inmates for periods of 1 to 3 years, and 18 jurisdictions housed inmates for periods greater than 3 years. (*Id.*). In other words, the type of confinement the plaintiff was subjected to during the relevant time in this case, including the length of confinement (281 days), was frequently used by correctional officials across the country during, and after, the relevant conduct in this case.

Moreover, the Federal Bureau of Prisons ("BOP"), where prisoners sentenced by this Court are remanded, also utilizes such confinement, even now, nearly 5-years after the relevant conduct in this case.[18] As of May 18, 2022, the BOP had 9,738 inmates in "special housing units" or "restricted housing,"[19] and of those inmates, 417 have been in such housing for more than 180 days, and 45 of those inmates have been in such housing for more than a year. (Ex. N, p. 2). As such, it cannot be said in 2017 and 2018, that confining an inmate with documented disciplinary issues, and who officials deemed posed a threat to the safety, security, and order of the facility, to a single-cell at Northern for 9-months "violates contemporary standards of decency." *See Rhodes*, 452 U.S. at 346 ("Eighth Amendment judgments should neither be nor appear to be merely the subjective views' of judges . . . .[b]ut such 'judgments should be informed by objective factors to the maximum possible extent.").

---

[18] The defendants have included as Exhibit N, a printout of the current statistics from the BOP's website concerning the use of "Restricted Housing," updated as of May 18, 2022. The page numbers cited in Exhibit N refer to the page numbers generated by PACER. The BOP's statistics on the use of restricted housing, which is updated weekly, can be accessed at: BOP Statistics: Inmate Release Numbers.

[19] Notably, these numbers do not even include the nearly 900 inmates housed in other types of restrictive housing units, such as "special management units" or housed at ADX Florence, BOP's maximum-security facility. *See* (Ex. N, p. 2-4).

In sum, the plaintiff cannot establish that his confinement to cell at Northern for most of each day during the relevant 9-month period constitutes a "sufficiently serious deprivation," or otherwise deprived him of any basic human need. Nor can the plaintiff establish that the use of such confinement violates contemporary standards of decency. Accordingly, the plaintiff cannot establish the objective prong of his claim, and judgment must enter in favor of the defendants.

### b. Subjective Prong

This claim must further fail as the plaintiff cannot establish the subjective prong. While the plaintiff cannot establish the personal involvement of several of the defendants (Semple, Mulligan, Maiga, and Quiros), as previously detailed, the evidence also establishes that he cannot establish that any of the remaining defendants (Faneuff, Molden, and Robles) were deliberately indifferent.

As an initial matter, "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Farmer*, 511 U.S. at 837. "The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment . . . . [and] among unnecessary and wanton inflictions of pain are those that are totally without penological justification." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (internal quotation marks & citations omitted). In this case, there can be no dispute that the plaintiff's confinement at Northern between August 1, 2017 and May 9, 2018 was not "totally without penological justification." Indeed, the plaintiff was placed on special needs, which is a status "[f]or inmates who have demonstrated behavioral qualities either through the serious nature of their crime, behavior or reasonable belief that they continue to pose a threat to the safety and security of staff, other inmates, themselves, or the public," based on his behavior and conduct in prison, which in the view of non-party prison officials, posed a risk to the safety, security, and order of DOC facilities. (Def. L. R. 56(a)(1) Statement, ¶¶ 35-36). While the plaintiff's instant suit does not, and could not, challenge his initial placement on special needs, or any occurrences prior to August 1, 2017, there is no dispute that he was transferred to Northern from HCC on August 1, 2017 due to picking up a DR and posing a risk to the safety, security, and order of that

facility. (*Id.* at ¶ 38). Hence, the plaintiff's confinement at Northern beginning on August 1, 2017 was not "totally without penological justification" but was based on his recent conduct.

Therefore, to prevail on his claim, the plaintiff must establish that the defendants were aware that his confinement between August 1, 2017 and May 9, 2018 to cell at Northern for most of each day posed a substantial risk of serious harm to him and that they deliberately disregarded that risk. The plaintiff cannot do so. Indeed, there is absolutely no evidence that defendant Faneuff was aware that the plaintiff's confinement to a cell at Northern for most of each day between August 1, 2017 and October 13, 2017, posed substantial risk of serious harm to his health, nor is there any evidence that defendants Molden or Robles were aware that his confinement during this 9-month period at Northern posed a substantial risk of serious harm to his health. (*Id.* at ¶ 68). To the contrary, the plaintiff never raised any specific complaints to the defendants indicating that his confinement to a single cell posed a substantial risk to his health. (Ex. C, ¶ 34; Ex. D, ¶ 16; Ex. G, ¶ 31). In fact, rather than raise any complaints, the plaintiff admittedly preferred living alone in a cell. (Ex. A, p. 15:22-16:16).

Additionally, there is no evidence establishing that any defendant was otherwise aware that the plaintiff's confinement to cell at Northern for most of each day during this period posed a substantial risk of serious harm to him. To the contrary, as previously detailed, the plaintiff's confinement on special needs was regularly reviewed by the classification committee at Northern, and these periodic reviews included mental health staff providing their input regarding his mental health status. (Def. L. R. 56(a)(1) Statement, ¶¶ 27, 30). The defendants were never informed that the plaintiff's mental or physical health were at risk of serious harm based on his confinement at Northern between August 1, 2017 and May 9, 2018.[20] (*Id.* at ¶ 68). The defendants, as non-medical prison officials, justifiably relied upon the input, opinions, and recommendations of mental health professionals concerning the

---

[20] In fact, had they been, defendants Faneuff, Molden, and Robles would not have disregarded such concerns, but rather, would have deferred to the mental health professionals as to the actions to be taken to appropriately address such concerns. (Def. L. R. 56(a)(1) Statement, ¶ 69).

plaintiff's mental health status.  *See Anderson v. Ford*, No. 3:06-CV-1968 (HBF), 2007 U.S. Dist. LEXIS 76718, at *25-26 (D. Conn. Oct. 16, 2007) (explaining that a non-medical prison administrator "justifiably may  defer to the medical expert regarding treatment of inmate/patients . . . [and] [t]his is especially so when prison administrators do not have the authority to order surgery or other sought-after treatment") (citations omitted); *Allah v. Thomas*, 679 Fed. Appx. 216, 220 (3d Cir. 2017) (dismissing Eighth Amendment claim against "non-medical defendants because there are no allegations that these prison officials were involved in any of the decisions regarding the non-treatment").  Simply put, the evidence establishes that none of the defendants were aware of, let alone deliberately disregarded, any substantial risk of serious harm posed to the plaintiff by his confinement at Northern during the relevant 9-month period.  Accordingly, judgment must enter in favor of the defendants.

### c.  Qualified Immunity

Alternatively, the defendants are entitled to qualified as to this claim.  For one, the defendants are entitled to qualified immunity as the plaintiff failed to establish a constitutional violation, as detailed above.  *See Taylor*, 135 S. Ct. at 2044.  The defendants are further entitled to qualified immunity as the plaintiff's confinement to cell at Northern for most of each day for a 9-month period did not violate any clearly established right of which a reasonable correctional official would have known, and it was objectively reasonable for the defendants to believe that their actions were lawful at the time.

<u>Lack of a Clearly Established Right</u>

Here, the defendants are entitled to qualified immunity as it was not clearly established at the time of the relevant conduct in this case, 2017 and 2018, that confinement to cell for most of each day for a 9-month period violated a prisoner's Eighth Amendment rights.  A case that is instructive on this point is *Tuttle v. Semple*, No. 3:17-CV-2037 (JAM), 2018 U.S. Dist. LEXIS 75412 (D. Conn. Feb. 5, 2018).  In *Tuttle*, Judge Meyer examined a prisoner's claim that "in light of his mental health conditions his assignment to solitary administrative segregation at [Northern] amounted to cruel and unusual punishment."  *Tuttle*, 2018 U.S. Dist. LEXIS 75412, at *8.  In *Tuttle*, the prisoner was confined at

Northern for approximately one year (January 2017 to December 2017) on administrative segregation status, whereby he was "confined to his cell for 24 hours a day, and defendants subjected him to 'long term and extreme social isolation and sensory deprivation conditions of segregated confinement' that 'exceeded the limit of human endurance.'" *Id*. at *2, 4. Upon initial review, Judge Meyer found that "it seems likely that the defendants whom plaintiff has sued here are entitled to qualified immunity from plaintiff's Eighth Amendment solitary confinement claim." *Id*. at *13.

In reaching that conclusion, Judge Meyer examined the Second Circuit's decision in *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48 (2d Cir. 2017). As noted by Judge Meyer, *Allah* involved "a pretrial detainee who was held in administrative segregation at [Northern] for about 11 months" and who was confined to a cell for "23 hours a day" and only permitted to depart his cell for limited times and reasons. *Id.* at *11 (citing *Allah*, 876 F.3d at 53). And while the Second Circuit in *Allah* found a violation of the detainee's Fourteenth Amendment due process rights, it "concluded that the defendant officials should have been granted qualified immunity because the lack of clearly established law that what they were doing was unconstitutional." *Id.* at *12-13 (citing *Allah*, 876 F.3d at 59). "[T]he Second Circuit noted that no decision 'has prohibited the confinement of pretrial detainees under the conditions imposed here if those conditions are imposed upon an individualized finding that a particular detainee poses a threat to security.'" *Id.* at *13 (quoting *Allah*, 876 F.3d at 59). In concluding the defendants were likely entitled to qualified immunity in light of *Allah*, Judge Meyer noted that "a convicted prisoner has fewer rights to protection from severe conditions of confinement than the plaintiff in *Allah* who was a pre-trial detainee[,]" and that convicted prisoners, like the plaintiff in this case, have "a steeper road to recovery than the plaintiff in *Allah*, and *Allah* itself disclaimed ruling on the rights of a convicted prisoner." *Id.* at *13-14 (citing *Allah*, 876 F.3d at 53 n. 1 & 58 n. 6).

In this case, the Court should reach the same conclusion as Judge Meyer concerning qualified immunity. As of February 5, 2018, when the *Tuttle* decision was issued, it was not clearly established

that confinement to a cell alone for 24 hours a day at Northern for approximately one year violated the Eighth Amendment. In this case, the plaintiff was confined at Northern for a period of 9-months, less than the period examined in *Tuttle* (1-year), and less than the period examined by the Second Circuit in *Allah* (11-months). Most of the conduct at issue in this case occurred prior to the *Tuttle* decision, and the undersigned has found no case from the Second Circuit or the Supreme Court between February 5, 2018 (date of the *Tuttle* decision) and May 9, 2018 (when the plaintiff transferred out of Northern) that clearly established such a right. And as Judge Meyer correctly noted concerning qualified immunity, the court's role "is not to pass upon potential policy or legal reforms but solely to evaluate the possible monetary liability of individual defendants in light of what was or was not clearly established." *Id.* at *16 (citing *Freeman v. Berge*, 180 F. Supp.2d 1009, 1016-17 (W.D. Wis. 2003) (noting that "agreement among mental health professionals regarding the deleterious effects of solitary confinement does not translate into legal notice that defendants may have been violating the Eighth Amendment" and that "[i]n the absence of case law concluding that conditions similar to those alleged by plaintiff are unconstitutional, I must conclude that defendants are entitled to qualified immunity on plaintiff's claim that he was subjected to sensory deprivation and social isolation" from solitary confinement)). In other words, regardless of whether one believes that legal or policy reforms may be needed in this area of corrections, the status of the law concerning this issue was not clearly established at the time of the relevant conduct in this case and the individual defendants cannot be held liable.

While the defendants submit that they are entitled to qualified immunity for the lack of a clearly established right prior to the conduct at issue in this case, the defendants wish to make a few points about the *Allah* decision as it relates to their qualified immunity argument. First, the *Allah* decision does not clearly establish the right at issue in this case, which deals with the Eighth Amendment and the rights of a sentenced prisoner, as the *Allah* decision examined the Fourteenth Amendment and the rights of a pretrial detainee, and "a convicted prisoner has fewer rights to protection from severe

conditions of confinement than the plaintiff in *Allah* who was a pre-trial detainee." *Tuttle*, 2018 U.S. Dist. LEXIS 75412, at *13-14 (citation omitted). In fact, as Judge Meyer noted, "*Allah* itself disclaimed ruling on the rights of convicted prisoners . . . . [and] [i]t remains debatable to what extent the protections recognized by the Second Circuit for the segregation of pre-trial detainees in *Allah* apply to a convicted prisoner . . . . ." *Id.* (citing *Allah*, 876 F.3d at 53 n.1 & 58 n. 6). As such, *Allah* cannot serve as the clearly established right in this case. Moreover, if a right is not clearly defined in the eyes of a District Court judge, it cannot be said to be "beyond debate" and clearly established for qualified immunity purposes. *See Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject [officers] to money damages for picking the losing side of the controversy."); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("[P]recedent must have placed the statutory or constitutional question beyond debate.").

Second, even if *Allah* could constitute the "clearly established" right, despite not dealing with the Eighth Amendment,[21] the defendants are still entitled to qualified immunity. For one, the *Allah* decision was released on November 22, 2017, and therefore, the defendants are entitled to qualified immunity for any occurrences prior to that date.[22] Additionally, Judge Meyer's opinion in *Tuttle* is again instructive on this point, as he "assume[d] for the moment that *Allah* applies with equal force to Eighth Amendment claims" but found that "[e]ven so . . . the defendants would likely still have qualified immunity." *Tuttle*, 2018 U.S. Dist. LEXIS 75412, at *14. In reaching that conclusion, Judge Meyer found that "to the extent that *Allah* requires an individualized risk/security assessment as to a predicate for assignment of a prisoner to administrative segregation at [Northern], the records . . . suggest a lengthy history of assaultive and threatening conduct, indicating strong reason to believe that prison officials could reasonably have believed it appropriate for security or disciplinary reasons to

---

[21] To be clear, the defendants in no manner believe or concede that *Allah* clearly establishes the right at issue in this case; however, they advance these arguments for purposes of this motion.

[22] Important to this argument, defendant Faneuff had no personal involvement after October 13, 2017.

assign plaintiff to a segregated housing unit." *Id.* Similarly, in this case, the plaintiff's 9-month confinement at Northern, a period less than the prisoners in *Tuttle* and *Allah* spent at Northern, was based on recent conduct and disciplinary issues, which in the view of prison officials, posed a risk to the safety, security, and order of DOC facilities. (Def. L. R. 56(a)(1) Statement, ¶¶ 34-35, 38, 62-65).

Additionally, "[a]s to plaintiff's complaint about the harshness of the conditions to which he was subject, the defendants are no more liable for those conditions than the defendants in *Allah*." *Tuttle*, 2018 U.S. Dist. LEXIS 75412, at *15. In fact, in *Allah*, the Second Circuit explained that the measures imposed on Allah, a pretrial detainee, which included 11-months at Northern confined to a cell alone for 23-hours per day, "are not categorically out of bounds for all pretrial detainees . . . [a]nd courts will generally be highly deferential to judgments about the conditions of confinement necessary to protect inmates and staff, and the public outside the facility, from particularly dangerous individuals, even pretrial detainees." *Allah*, 876 F.3d at 53-54, 58. In other words, far from clearly establishing that a sentenced prisoner cannot be confined to a cell for most of each day for a 9-month period, as in this case, the Second Circuit in *Allah* confirmed that such conditions are constitutionally permissible, even for pre-trial detainees, who have greater constitutional protections than sentenced prisoners. Importantly, in its qualified immunity analysis, the Second Circuit noted that there are no decisions that have "prohibited the confinement of pretrial detainees under the conditions imposed here if those conditions are imposed upon an individualized finding that a particular detainee poses a threat to security" and that "in deciding what restrictions could legitimately be placed on a *particular* detainee, Defendants lacked definitive guidance from the Supreme Court or from this Court." *Id.* at 59 n. 7.

<u>Defendants' Actions were Objectively Reasonable</u>

The defendants are further entitled to qualified immunity as their conduct was objectively reasonable, and no reasonable official in their position would believe they were violating any of the plaintiff's clearly established rights. In fact, to the extent the Court does find that the right as issue was clearly established, despite the case law speaking otherwise, the defendants are still entitled to qualified

immunity. Indeed, under the second prong of the qualified immunity analysis, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Taravella,* 599 F.3d at 134.

Here, the defendants are entitled to qualified immunity as it was objectively reasonable to believe that confining a sentenced prisoner on special needs with a lengthy and recent history of disciplinary violations to a cell alone at Northern for most of each day during a 9-month period was not unlawful.[23] This is supported not only by the fact that such type of confinement at issue was utilized in over 30 other jurisdictions during the relevant time, as previously detailed, but also based on the status of the law, including Judge Meyer's reasoning in *Tuttle,* as well as the recent and repeated decisions from courts within this Circuit upholding the legality of the type of confinement at issue in this case for similar, and even longer, periods of time than in this case.[24] This is especially so in this case, given the fact that the plaintiff's confinement at Northern during this 9-month period was reviewed periodically, and as previously detailed, included input from mental health staff concerning his mental health status, and there were no indications during these reviews that his mental or physical

---

[23] This argument is even stronger for defendant Faneuff, who was only at Northern for 3-months during the relevant time.

[24] *See, e.g., Pagan,* 2019 U.S. Dist. LEXIS 106786, at *8, 14-15 (finding inmates placement in segregation for *two* years in SRG program at Northern whereby "he [was] confined in his cell 23 to 24 hours per day" and was deprived of phone privileges, visits, and access to programs and services "do not support an Eighth Amendment claim for inhumane conditions of confinement") (citing cases) (emphasis added); *Caimite v. Venettozzi,* No. 9:17-CV-919 (GLS/CFH), 2018 U.S. Dist. LEXIS 185631, at *23-25 (N.D.N.Y Oct. 29, 2018) (dismissing Eighth Amendment claim brought by prisoner who was confined for *360 days* in restrictive housing and confined to a cell "for twenty-three hours a day with visitation restrictions and without access to educational and work programs, telephone, or commissary[,]" finding that such alleged conditions "failed to adequately plead an Eighth Amendment conditions of confinement claim") (emphasis added), *report and recommendation adopted,* 2018 U.S. Dist. LEXIS 197502, (N.D.N.Y. Nov. 20, 2018); *see also Doyle,* 2019 U.S. Dist. LEXIS 181125, at *20-21 (finding that "[a]lthough the conditions described [in the SRG program] may be harsh," including, *inter alia,* "confined to a cell for 23 hours per day; only one hour of outdoor recreation per weekday; no, or limited, indoor recreation; . . . [and] no programming" they "do not deprive the plaintiff of any basic human need, and therefore, are not unconstitutional"); *Davis,* 2019 U.S. Dist. LEXIS 215346, at *23-26 (dismissing Eighth Amendment claim arising from inmate's confinement for "five months in administrative segregation at Northern Correctional Institution[,] [which] entailed twenty-three hours of confinement within his cell and allowed only one hour of exercise" finding that such conditions did not constitute an objectively serious deprivation); *Edward v. Gutwein,* No. 21-CV-3183 (PMH), 2022 U.S. Dist. LEXIS 65140, at *20-21 (S.D.N.Y. April 7, 2022) (dismissing prisoner's Eighth Amendment claim, which arose from "137 days in solitary confinement" where he "was restricted to a cell for 23 hours per day" among other restrictions, finding that such "conditions are not in themselves sufficiently serious to provide a basis for an Eighth Amendment claim") (citing cases).

health were at a substantial risk of serious harm based on his confinement at Northern. *See Edwards v. City of New York*, No. 15-CV-3637 (SHS), 2019 U.S. Dist. LEXIS 127894, at *31-32 (S.D.N.Y. July 31, 2019) (holding that prison official was entitled to qualified immunity under New York law, which applies same standard as federal qualified immunity analysis, on claim that "it was unreasonable to place an adolescent with known mental problems in solitary confinement for nearly six months[,]" finding that "[g]iven that [defendant] followed DOC protocol by deferring to the mental health staff's review of [prisoner's] fitness for solitary confinement, it is clear at a minimum that officers of reasonable competence could disagree as to whether her conduct was appropriate") (citation omitted).

Therefore, the defendants are entitled to qualified immunity as their actions were objectively reasonable given the status of the law and the information available to them, and no reasonable official in their position would believe that they were violating any of the plaintiff's clearly established rights.

## ii. Lack of Access to Recreational & Other Programming

The plaintiff claims that at Northern he "never had more than one or two hours a day of 'outside' recreation" and "had no access to meaningful educational and other programming," (ECF No. 21, ¶ 30); however, the plaintiff cannot maintain an Eighth Amendment claims based on this. Regarding the plaintiff's claim concerning lack of recreation, "[b]oth the Supreme Court and the Court of Appeals for the Second Circuit recognize exercise as a basic human need that must be provided for inmates." *Shakur v. Sieminski*, No. 3:07-CV-1239 (CFD), 2009 U.S. Dist. LEXIS 60796, at *12 (D. Conn. July 15, 2009) (citing cases). "While courts have found that denial of all opportunity to exercise violates an inmate's constitutional rights, they have found no violation where the inmate has an opportunity for exercise, either in or outside of his cell." *Id.* Additionally, "[t]o state a cognizable Eighth Amendment claim for denial of recreation, [a plaintiff] must show that the denial of the opportunity to exercise resulted in tangible physical harm and that the restriction was not the result of any legitimate penological goal such as inmate or staff safety or maintenance of the facility." *Id.* (citing cases).

Here, the plaintiff's claim regarding lack of access to recreation is wholly without merit. Indeed, in accordance with AD 9.4, the plaintiff was permitted at least two hours of recreation per day, six days per week, while on special needs at Northern. (Def. L. R. 56(a)(1) Statement, ¶¶ 23, 54). In fact, by the plaintiff's own allegations, he had "one or two hours a day of 'outside' recreation[,]" (ECF No. 21, ¶ 31), and he reiterated at his deposition that he attended recreation. *See* (Ex. A, p. 88:6-12). This alone demonstrates the plaintiff cannot maintain his lack of recreation claim. *See Shakur*, 2009 U.S. Dist. LEXIS 60796, at *15 (noting that "[a]lthough the Second Circuit has approved one hour of outdoor recreation per day, it has not held that amount to be the constitutional minimum") (citing cases); *Turnage v. Dzurenda*, No. 3:13-CV-838 (VLB), 2015 U.S. Dist. LEXIS 109889, at *8 (D. Conn. Aug. 20, 2015) (dismissing denial of recreation/exercise claim based on, *inter alia*, the fact that "Plaintiff acknowledged that he received over an hour of exercise per day"). Moreover, the plaintiff was able to exercise in his cell if chose to, (Def. L. R. 56(a)(1), ¶ 54), and he has adduced no evidence establishing that he suffered any tangible physical injury based on any purported lack of recreation during the relevant time. *See Shakur*, 2009 U.S. Dist. LEXIS 60796, at *12-13. As such, the plaintiff cannot establish the objective prong. Similarly, the plaintiff cannot establish the subjective prong, as he cannot establish that any defendant was aware of any purported lack of access to recreation and that such lack of access posed a substantial risk of serious harm to him, and deliberately disregarded it.

The plaintiff's claim concerning lack of access to "meaningful educational and other programming" also fails to state an Eighth Amendment claim. It is well-established that inmates have no constitutional right to educational or rehabilitative programming. *See Pagan*, 2019 U.S. Dist. LEXIS 106786, at *14-15 (dismissing Eighth Amendment claim where prisoner alleged that his placement in segregation whereby "he [was] confined to his cell 23 to 24 hours per day" and deprived of various privileges, including "access to educational and vocational services" finding that such "conditions do not support an Eighth Amendment claim for inhumane conditions of confinement")

(citing cases); *Doyle*, 2019 U.S. Dist. LEXIS 181125, at *20-21 (dismissing Eighth Amendment claim where prisoner alleged that he was "confined to a cell for 23 hours per day" and had various restrictions imposed on him, including "no programming" finding that "they do not deprive the plaintiff of any basic human need and, therefore, are not unconstitutional"); *see also Moody v. Daggett*, 429 U.S. 78, 88 n. 9 (1976) (prisoners have no right to rehabilitative programing). Accordingly, the plaintiff cannot establish an Eighth Amendment violation based on his lack of access to programming during his 9-month confinement at Northern. Alternatively, for namely these same reasons, the defendants are entitled to qualified immunity, as given the status of the law, no reasonable correctional official would believe they were violating any of the plaintiff's clearly established rights.

### iii.  Lack of Contact with Outside World

The plaintiff claims that while at Northern "[i]nteractions with the outside world are extremely limited, typically restricted to just one thirty-minute social visit per week." (ECF No. 21, ¶ 28). The plaintiff's claim that his rights were violated based on the alleged lack of contact with the outside world during his 9-month confinement at Northern is wholly without merit. As an initial matter, as this Court has previously noted, "[a]n inmate has no Eighth Amendment right to visitation or to make social telephone calls." *Baltas v. Erfe*, No. 3:19-CV-1820 (MPS), 2020 U.S. Dist. LEXIS 68759, at *74 (D. Conn. April 20, 2020) (citing cases). Indeed, "loss of privileges, in general, does not amount to infliction of cruel and unusual punishment; and loss of visitation and telephone privileges is no exception to this rule." *Marrero v. Weir*, No. 3:13-CV-28 (RNC), 2014 U.S. Dist. LEXIS 136456, at *7 (D. Conn. Sept. 26, 2014) (citing cases). Thus, the plaintiff cannot maintain an Eighth Amendment claim based on his alleged lack of contact with the outside during his 9-month period at Northern.

The plaintiff's claim further fails from a factual standpoint. Indeed, inmates on special needs are permitted a minimum of three fifteen-minute social phone calls per week, a minimum of three one-hour social visits per week, legal visits as needed, and can send and receive mail. (Def. L. R. 56(a)(1) Statement, ¶¶ 23-24, 55). In other words, the plaintiff had access to communicate with the outside

world through phone calls, visits, and mail. Moreover, the plaintiff cannot establish that any purported lack of access to communicate with the outside world deprived him of a basic human need or otherwise exposed him to a substantial risk of serious harm,[25] or that any defendant was aware of such and deliberately disregarded it. And to the extent his claim is that he was deprived of social contact during his confinement at Northern during the relevant time, such a claim is without merit, as previously detailed. *See* Discussion *supra* Section III (D)(i)(a), p. 22-23. Accordingly, judgment must enter in favor of the defendants, and for these same reasons, the defendants are entitled to qualified immunity.

### iv. Restraints

As noted by the Court, the plaintiff alleges that while at Northern on special needs, he was "restrained in handcuffs, leg irons, and a tether chain when outside his cell." (ECF No. 115, p. 3). To the extent the plaintiff seeks to raise an Eighth Amendment claim based on this, he cannot establish such a claim. As an initial matter, contrary to the plaintiff's allegations that while on special needs at Northern he was placed in full restraints when moving outside of his cell, the evidence establishes otherwise. Indeed, the plaintiff testified at his deposition that while on special needs he was taken off restraint status at various times based on the classification committee's periodic reviews. *See* (Ex. A, p. 149:24-150:17). Importantly, the evidence establishes that during the relevant time, the plaintiff was only on a restraint status for less than one month, from August 1, 2017 until August 29, 2017. (Def. L. R. 56(a)(1) Statement, ¶ 58). The plaintiff cannot maintain an Eighth Amendment claim based on this.

For one, the plaintiff cannot satisfy the objective prong as the "use of shackles and handcuffs (whether in front or in back) while moving prisoners does not constitute an extreme deprivation." *Graham v. Fries*, No. 93-CV-3377 (JG), 1996 U.S. Dist. LEXIS 22735, at *32 (E.D.N.Y. Oct. 16, 1996), *aff'd*, No. 97-7076, 1997 U.S. App. LEXIS 29703 (2d Cir. Sept. 3, 1997); *see also Branham v. Meachum*, 77 F.3d 626, 631 (2d Cir. 1996) (affirming dismissal of Eighth Amendment claim regarding

---

[25] In fact, the plaintiff testified that he didn't "cherish" visits or phone calls. (Ex. A, p. 178:15-18).

prisoner's placement on full restraints status because, *inter alia*, condition was not unduly harsh).

Moreover, there is no evidence that placing the plaintiff on a restraint status for such a brief period, and for routine movements outside of the cell, deprived him of a basic human need or otherwise exposed him to a substantial risk of serious harm. *See Ashby v. Quiros,* No. 3:17-CV-916 (CSH), 2018 U.S. Dist. LEXIS 85181, at *7-9 (D. Conn. May 22, 2018) (dismissing on initial review a prisoner's Eighth Amendment claim concerning his placement in full restraints every time he left his cell, finding that such allegations alone "do not state a plausible claim that the restraint policy has compromised Plaintiff's heath or safety or otherwise deprived him of his basic human needs") (citing cases); *Campbell v. Quiros*, No. 3:17-CV-946 (CSH), 2018 U.S. Dist. LEXIS 23207, at *7 (D. Conn. Feb. 13, 2018) (dismissing Eighth Amendment claim on initial review as "Plaintiff has not alleged that the requirement that he be placed in handcuffs and leg restraints every time he leaves his cell deprives him of one of life's necessities"); *Graham*, 1996 U.S. Dist. LEXIS 22735, at *32 ("[T]he use of shackles and handcuffs (whether in front or in back) while moving prisoners . . . . does not deprive a prisoner of a life necessity."). In fact, courts have found the objective prong was not satisfied even where prisoners were placed in restraints during outdoor recreation. *See, e.g., Morgan v. Rowland*, No. 3:01-CV-1107 (CFD), 2006 U.S. Dist. LEXIS 11081, at *24-26 (D. Conn. Mar. 17, 2006) (granting summary judgment to prison official on claim that prisoner's Eighth Amendment rights were violated by being placed in full restraints for recreation during 6-month period).

Nor can the plaintiff establish the subjective prong of this claim. "[U]nder the deliberate indifference standard, the imposition of a restraint order only violates Eighth Amendment protections if imposed restraint is totally without penological justification, grossly disproportionate, or involves the unnecessary and wanton infliction of pain." *Gibson v. Rosati*, No. 9:13-CV-503 (GLS/TWD), 2017 U.S. Dist. LEXIS 35524, at *52 (N.D.N.Y. Mar. 10, 2017) (internal quotation marks omitted) (citing

cases), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 63729 (April 27, 2017). "This is because prions officials are granted wide latitude to place restraints on inmates." *Id.* (citation omitted).

In this case, the evidence establishes that the plaintiff was briefly placed on a restraint status upon his arrival to Northern on August 1, 2017 due to his recent disciplinary and behavioral issues at HCC that caused his transfer, and is a tool used for the protection of staff and inmates, as well as to maintain safety, security, and order within the facility. (Def. L. R. 56(a)(1) Statement, ¶¶ 58-59). This condition was removed on August 29, 2017, based on the review of the plaintiff's status and the determination that such a condition was no longer necessary. (*Id.* at ¶¶ 60-61). As this demonstrates, the decision to place the plaintiff on a restraint status for a brief period was reasonably related to prison officials interest in maintaining safety, security, and order, and restoring discipline, and as such, was not "totally without penological justification." This is further bolstered by the fact that this condition was removed during the first periodic review of the plaintiff's status after his transfer to Northern, when it was determined, in the view of prison officials, that such a condition was no longer necessary. Importantly, there no evidence that the imposition of this condition for such a brief period was for purposes of unnecessarily and wantonly inflicting pain or punishment, nor is there is any evidence that any of the defendants were aware that the use of restraints on the plaintiff during routine movements outside of his cell for such a brief period deprived him of a basic human need or otherwise posed a substantial risk of serious harm to his health. As such, judgment must enter in favor of the defendants.

### Qualified Immunity

The defendants are also entitled to qualified immunity on this claim, not only for the plaintiff's failure to establish a constitutional violation, but also because their actions were objectively reasonable given the status of the law and there is no case from the Second Circuit or Supreme Court clearly establishing a sentenced prisoner's right to be free from restraints for movements outside of their cell.

A case that is instructive on this point is *Ashby v. Quiros*, 443 F. Supp.3d 232 (D. Conn. Mar. 10, 2020). In that case, Judge Haight conducted an in-depth analysis of the qualified immunity doctrine

and examined whether prison officials were entitled to qualified immunity on a prisoner's claim that DOC's policy requiring death-row inmates be in full restraints while outside of their cell, which was in effect for approximately 8-years, violated his constitutional rights. *See Ashby*, 443 F. Supp.3d at 237-238, 243-251. Although *Ashby* dealt with restraints in the context of a Fourteenth Amendment procedural due process claim, Judge Haight framed the qualified immunity inquiry as follows: "the Court's qualified immunity analysis asks if convicted inmates' right to be free from restraints while traveling in prison for routine movements and short durations" was clearly established. *Id.* at 251. Judge Haight concluded that the defendants were entitled to qualified immunity, noting that "[a]lthough a pretrial detainee's right to due process may have been clearly established at the time of the Northern administrators implemented the restraint policy, *it is not clear that the same could be said for convicted prisoners.*" *Id.* at 250 (emphasis added). Judge Haight further found it was "objectively reasonable" for the defendants to believe that such a restraint policy would not violate an inmate's rights. *Id.* at 251.

Although *Asbhy* examined qualified immunity in the context of the Fourteenth Amendment, not the Eighth Amendment, the way in which Judge Haight framed the qualified immunity inquiry supports qualified immunity for the defendants in this case. Indeed, the court found that it was not clearly established that "convicted inmates [have] [a] right to be from restraints while traveling in prison for routine movements and short durations." *Id.* at 251. Importantly, *Ashby* was released in March 2020, demonstrating that such a right for a convicted prisoner was not clearly established at that time. As such, no reasonable correctional official in the defendants' position in 2017 would believe that they were violating any of the plaintiff's clearly established rights by imposing restraints on him for such a brief period and for routine movements outside of the cell. This is especially so in this case, where the evidence establishes that such restraints were imposed on the plaintiff based on legitimate penological reasons and were removed once prison officials determined that such condition was no longer necessary. *See Gibson*, 2017 U.S. Dist. LEXIS 35524, at *52. Moreover, the plaintiff can point

to no Second Circuit or Supreme Court case that clearly establishes the plaintiff's right under the Eighth Amendment to be free from being placed in restraints for routine movements outside of the cell for less than a one-month period.  To the contrary, as the cases cited above demonstrate, courts in this Circuit have routinely found that the use of restraints in such a manner does not constitute an Eighth Amendment violation.  Accordingly, the defendants are entitled to qualified immunity.

### v.  <u>Conditions in Combination</u>

Finally, while each of the conditions constituting the basis of the plaintiff's Eighth Amendment claim fail to establish a constitutional violation on their own, as detailed above, it is also worth noting that such conditions, even in combination or in the aggregate, also fail to rise to the level of a constitutional violation.  Indeed, "conditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citation omitted).  Here, the plaintiff cannot establish that the four conditions identified above either alone, or in combination, rise to the level of an Eighth Amendment violation during his 9-month confinement at Northern.  To the contrary, as detailed above, none of these conditions have deprived the plaintiff of any basic human need, nor did these conditions in the aggregate deprive the plaintiff of any basic human need.   Accordingly, judgment must enter in favor of the defendants as to the plaintiff's Eighth Amendment claim.[26]

### IV.  <u>CONCLUSION</u>

**WHEREFORE**, for the foregoing reasons, the defendants respectfully submit that this motion should be granted in its entirety, and judgment should enter in favor of the defendants on all claims.

---

[26] Finally, the defendants note that the plaintiff has asserted claims for injunctive and declaratory relief; however, judgment must enter in favor of the defendants as to these claims for relief.  For one, the plaintiff has not established a constitutional violation, as detailed above.  Additionally, any such claims for relief are moot given the plaintiff's release from prison, and the fact that Northern, the facility whose conditions were alleged to have violated his rights, is now closed.  (Def. L. R. 56(a)(1) Statement, ¶¶ 18, 70); *see also McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020) ("An inmate's transfer [or release] from a prison facility moots claims for declaratory and injunctive relief against officials of the transferring facility.").

DEFENDANTS,
SEMPLE, ET AL.

WILLIAM TONG
ATTORNEY GENERAL

BY: _/s/ Edward Rowley_____
    Edward D. Rowley (ct30701)
    Terrence M. O'Neill (ct10835)
    Assistant Attorneys General
    110 Sherman Street
    Hartford, CT 06105
    Tel: (860) 808-5450
    Fax: (860) 808-5591
    E-Mail: Edward.rowley@ct.gov
          Terrence.oneill@ct.go

## **CERTIFICATION**

I hereby certify that on May 20, 2022, a copy of the foregoing was filed electronically. Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's System.

_____/s/_____
Edward D. Rowley